IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

NATIONAL FOOTBALL LEAGUE PLAYERS
ASSOCIATION, on its own behalf and on behalf
of ADRIAN PETERSON,

                            Petitioner,

     -v.-

NATIONAL FOOTBALL LEAGUE and
NATIONAL FOOTBALL LEAGUE
MANAGEMENT COUNCIL,

            Respondents.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

Case No. _____

**REDACTED PETITION TO
VACATE ARBITRATION
AWARD**

SCANNED
DEC 1 5 2014
U.S. DISTRICT COURT MPLS

Petitioner National Football League Players Association ("NFLPA" or "Union"), on its own behalf and on behalf of Adrian Peterson, hereby petitions, pursuant to Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185 ("LMRA") and Section 10 of the Federal Arbitration Act, 9 U.S.C. § 10 ("FAA"), to vacate the December 12, 2014 arbitration award issued by Harold Henderson ("*Peterson* Arb. Award") (Ex. 126 hereto[1]), an arbitrator unilatera lly desi gnated b y Co mmissioner Roger Go odell of Respondent National Football League ("NFL" or "League") to arbitrate Mr. Peterson's disciplinary appeal:

## PRELIMINARY STATEMENT

1.      This Petition presents the Court with the rare Arbitration Award that must be set aside. The Award is legally defective in myriad respects: it is contrary to the essence of the NFL-NFLPA Collective Bargaining Agreement ("CBA"); it defies fundamental principles of notice, fairness, and consistency; and it was rendered by an evidently partial arbitrator who exceeded the scope of his authority.

---

[1] Exhibit citations herein refer to the exhibits submitted with this Petition. Petition exhibit numbers 1-119 coincide with the numbers of all of the exhibits submitted by the NFLPA and Mr. Peterson in the underlying Article 46 arbitration proceeding before Mr. Henderson, which resulted in the issuance of the Arbitration Award.

Although all of the arbitration record has been submitted to the Court, this Petition cites to only selected portions therefrom.

Petitioner has also filed contemporaneously with the Court an *ex parte* motion to file certain of those exhibits under seal, as well as selected portions of this Petition. The portions of the Petition that Petitioner seeks to file under seal are highlighted in this unredacted version of the Petition.

2.     Mr. Peterson is a running back for the Minnesota Vikings who was suspended indefinitely by NFL Commissioner Roger Goodell.  The Arbitration Award rejected every aspect of Mr. Peterson's appeal and upheld Commissioner Goodell's discipline in its entirety.

3.     In so holding, the Arbitration Award sustained retroactive punishment of Mr. Peterson under Commissioner Goodell's recently adopted Personal Conduct Policy for domestic violence (the "New Policy") without the prior notice required by fundamental principles of industrial due process.  Prior to the implementation of this New Policy, no first-time offender of any NFL disciplinary policy—as Mr. Peterson is—had ever received more than a two-game suspension for any type of domestic violence incident.  Thus, had Mr. Peterson's discipline been lawfully assessed under the applicable disciplinary policies and practices in place prior to the New Policy, he could not lawfully have been suspended for more than two games.

4.     In suspending Mr. Peterson indefinitely, Commissioner Goodell— apparently motivated by public calls for his resignation due to prior disciplinary failures— ignored settled "law of the shop" prohibiting retroactive application of the New Policy, defied the CBA and arbitral law principles of notice, fairness, and consistency of treatment, and ran roughshod over the required procedural protections of the CBA.  Then, to insulate his own actions from any type of meaningful review, Commissioner Goodell designated someone he knew to be an evidently partial, NFL insider—Harold Henderson, the former head of the NFL Management Council charged with labor negotiations with the NFLPA— to hear Mr. Peterson's disciplinary appeal.  Sticking to the Commissioner's script, Mr.

2

Henderson summarily rubber-stamped the unlawful process and punishment of Mr. Peterson in the Arbitration Award without regard for the CBA or the precedents he was bound to apply.

5.      Since July of this year, Commissioner Goodell has been at the epicenter of public outrage over the NFL's response to the "elevator incident" involving NFL player Ray Rice and, more broadly, the NFL's historically lenient treatment of acts of domestic violence (*i.e.*, the two-game maximum suspension for first-time offenders). On this issue, criticism of the NFL has come in the form of calls for the Commissioner's resignation, excoriation of the League by news and sports media alike, threats by corporate partners to revoke their financial support of the League and teams, and even condemnation from three U.S. Senators and twelve Congressmen demanding harsher penalties and greater transparency in the NFL's disciplinary processes for domestic violence offenses.

6.      Rather than negotiate in good faith with the NFLPA on a new disciplinary policy to be applied to NFL players, Commissioner Goodell has tried to dig his way out of the public maelstrom by arbitrarily applying disciplinary measures, for purposes of public consumption, and subordinating NFL players' CBA and arbitral rights. The Arbitration Award sustaining Mr. Peterson's punishment is just the latest manifestation of the Commissioner's recent history of applying disciplinary procedures to players in an arbitrary and inconsistent fashion at his whim. As the summary below shows, this history speaks for itself.

7.      ***"Bounty-gate."*** In 2012, faced with a massive lawsuit concerning former NFL players suffering from concussions and other head trauma (recently settled for an

estimated $1 billion), Commissioner Goodell imposed unprecedented suspensions on four New Orleans Saints players for allegedly engaging in a "bounty" program encouraging violent in-game hits. *See* Ex. 36 (*Bounty* Final Decision on Appeal, slip op. at 2-3, 13, 18). There, as here, the NFLPA was left with no choice but to file a judicial Petition for Vacatur because Commissioner Goodell had cast aside the suspended players' rights to fundamentally fair disciplinary proceedings and consistent treatment in favor of trying to demonstrate to the world that the NFL had suddenly become vigilant about player safety. The *Bounty* federal court litigation eventually led to Commissioner Goodell agreeing to the appointment of an outside arbitrator, former NFL Commissioner Paul Tagliabue, to hear the players' disciplinary appeals.

8.     Mr. Tagliabue vacated the four players' suspensions in their entirety. *Id.* at 2. He concluded that Commissioner Goodell's punishments had been "selective, ad hoc, or inconsistent," and therefore "arbitrary and . . . an impediment rather than an instrument of change." *Id.* at 6. The decision by a former NFL Commissioner was a vivid example of how Commissioner Goodell's willingness to cast player CBA protections aside in favor of issuing arbitrary and inconsistent discipline to promote the League's own public relations agenda.

9.     ***Ray Rice.***   This past July, the NFL suspended Mr. Rice for two games without pay (plus a one-game fine) for the widely-publicized "elevator incident," based in part on the public disclosure of a video depicting what had happened "outside the elevator." Intense public criticism ensued. Commissioner Goodell and NFL lawyers first explained to the public that the two-game suspension of Mr. Rice represented the historical maximum

4

under the applicable June 1, 2013 Personal Conduct Policy, *see* Ex. 2 ("Previous Policy") for acts of domestic violence committed by NFL players without any prior offense. The discipline of Mr. Rice was thus the maximum permitted under the governing requirement of fair and consistent treatment.

10.    When the public was not assuaged, Commissioner Goodell further responded to the criticism on August 28, 2014 by promulgating—unilaterally, and without collective bargaining—the New Policy, *see* Ex. 4, which elevated the presumptive discipline for a first-time domestic violence offender to a six-game suspension. At the time the New Policy was announced, it was intended, as required by labor law and the CBA, to apply only *prospectively* to *future* acts of domestic violence. Significantly for this action, as detailed below, Commissioner Goodell did not—because he admittedly could not—seek to retroactively apply the New Policy to Mr. Rice, whose conduct occurred long before the New Policy was announced. As Commissioner Goodell testified under oath in explaining why he did not apply the New Policy to Mr. Rice:



Ex. 35 (*Rice* Hr'g Tr. 99:21-100:15) (Goodell).

11.    It was only after public disclosure of a second video, showing what had taken place "inside the elevator," and yet more public criticism that the two-game suspension of Mr. Rice had been insufficient, that Commissioner Goodell suspended Mr. Rice for a second time, this time indefinitely. To justify elevating Mr. Rice's original and final punishment, Commissioner Goodell accused Mr. Rice of having misled the NFL about

what had actually transpired inside the elevator. With the world watching, Commissioner Goodell agreed to the NFLPA's demand for a neutral arbitrator and appointed retired United States District Court Judge Barbara S. Jones to arbitrate Mr. Rice's disciplinary appeal. Not surprisingly, Judge Jones—an impartial decision-maker—held that Commissioner Goodell's claim that Mr. Rice had not been truthful was false and merely served as a pretext for the Commissioner's attempt to fix the self-described "mistake" he had made by establishing an historical two-game maximum suspension for first-time domestic violence offenders.

12.     Critically important here, Judge Jones expressly held that ***Commissioner Goodell lacked authority under the CBA to apply the New Policy to punish conduct that had occurred before it was announced***. *See* Ex. 119 (*Rice* Appeal Decision, slip op. at 16)("Recognizing that, even under the broad deference afforded to [Commissioner Goodell] through Article 46 [of the CBA], he could not retroactively apply the new presumptive penalty [under the New Policy] to Rice, the Commissioner called Rice to ensure him that his punishment would remain unchanged."); *id.* at 7 ("The policy change was forward looking because the League is 'required to provide proper notification'" of disciplinary changes.); *id.* ("After the policy change, [the Commissioner] called Rice and made clear to him that 'it didn't impact on him . . . He was given his discipline and we moved forward.'"). Judge Jones' ruling that the more severe disciplinary rules of the New Policy could not be applied retroactively became the "law of the shop" under the CBA.

13.     ***Adrian Peterson.*** Commissioner Goodell's indefinite suspension of Mr. Peterson is déjà vu all over again—the NFL's latest inconsistent and unlawful disciplinary

"solution" to the public criticism it continues to face with respect to its past disciplinary policies, *i.e.*, the disciplinary policies in effect at the time of Mr. Peterson's conduct. The only difference is that, this time, the appointment of an evidently partial arbitrator, as opposed to an independent arbitrator neutral like Judge Jones, has deprived Mr. Peterson of his right to an impartial arbitration of his disciplinary appeal.

14.     In May 2014, roughly four months before the enactment of the New Policy, Mr. Peterson was involved in a corporal punishment incident with his son that ultimately led to a November 4 plea of *nolo contendere* to a misdemeanor charge of reckless assault. The charge will be expunged from Mr. Peterson's record if he completes the requirements of his diversion program.

15.     While his criminal proceeding was pending, Mr. Peterson was deactivated for one game by the Vikings and then agreed to be placed in a special status—the so-called "Commissioner's Exempt List"—in which he would not be permitted to play in NFL games until the criminal proceeding ran its course, but would continue to receive his salary. Mr. Peterson spent seven games on the Commissioner's Exempt List before his criminal charges were resolved. The NFLPA and Mr. Peterson are not challenging this portion of Mr. Peterson's time on the Exempt List because it was agreed to by the player and the NFLPA.

16.     On November 5, 2014, after the criminal charges had been resolved, Mr. Peterson expected to return to the Vikings. But without applying any part of the CBA-mandated disciplinary process, the NFL informed Mr. Peterson that he would be forced to remain on the Commissioner's Exempt List—and thus barred from playing any games—

until Commissioner Goodell rendered a disciplinary decision and any arbitration appeal was exhausted. This immediate disciplinary measure, without any process or fact-finding, was unprecedented. It amounted to an immediately effective suspension (with pay) not permitted by the CBA or the NFL Player Contract. Indeed, just last week, on December 10, 2014, the Commissioner announced further revisions to the Personal Conduct Policy on domestic violence, this time specifying that the Commissioner Exempt List could be used for future disciplinary purposes. Ex. 123. Putting aside that these unilateral, non-collectively bargained revisions to player discipline are in and of themselves CBA and labor law violations, their promulgation for the first time on December 10 underscores the point that Mr. Peterson's summary banishment to the Commissioner Exempt List was not part of the Previous Policy which applied to Mr. Peterson's conduct.

17.     Mr. Peterson remained on the Commissioner Exempt List for several weeks and then, on November 18, the Commissioner wrote to Mr. Peterson that he was being formally suspended *under the New Policy* for "at least" the remainder of the 2014 season, *i.e.*, with no definitive end to the suspension. Thus, the Commissioner did exactly what he testified he would not do—and what Judge Jones held he could not do—in *Rice*: retroactively apply the New Policy to conduct that occurred before its imposition. This indefinite suspension came on top of Mr. Peterson's forced banishment to the Commissioner's Exempt List, meaning that the Commissioner will have prevented Mr. Peterson from playing in at least seven games this season, with no certainty as to whether or when Mr. Peterson will be permitted to return to the NFL. Whatever one thinks of Mr. Peterson's behavior, he was entitled to fair and consistent treatment under the CBA, in

accordance with the disciplinary polices in effect at the time of the behavior for which the League seeks to punish him.

18.    Additionally, under the terms of the Commissioner's suspension, Mr. Peterson must meet with a doctor of *the NFL's* own choosing and adhere to a program of counseling, therapy and community service designed by that medical designee.   Mr. Peterson is also subject to "periodic reviews" by the Commissioner, and he will be permitted to re-enter the League only when deemed fit for reinstatement by the Commissioner, with no specified criteria, sometime after April 15, 2015.  If the Vikings terminate Mr. Peterson's contract, he will find himself in limbo during the start of next year's free agency period in March.    This imposition of delayed and uncertain reinstatement constitutes a further unauthorized punishment causing irreparable harm to Mr. Peterson's future in the NFL.

19.    Indeed, the disciplinary requirement of submitting to treatment by NFL-designated doctors, as opposed to complying with court-imposed counseling, is unprecedented and unauthorized by the CBA.   While there are similar new treatment requirements for domestic violence offenders under the NFL's unilateral December 10 revisions to the New Policy, such changes again confirm that the purported requirements did not previously exist.   Nor is there an y conceivable, lawful basis to apply the m retroactively to Mr. Peterson.

20.    The NFLPA and Mr. Peterson appealed his unprecedented discipline under the arbitration provision of Article 46 of the CBA.  They demanded that the NFL agree to an impartial arbitrator from outside the NFL because Mr. Peterson's appeal, unlike most

Article 46 player discipline arbitrations (but just like the *Rice* arbitration), required an evaluation of Commissioner Goodell's conduct, including his testimony in *Rice* and his subsequent decision, under the weight of public pressure, to reverse course and retroactively apply the New Policy to Mr. Peterson.   Commissioner Goodell's unprecedented act of forcing Mr. Peterson onto the Commissioner's Exempt List also required outside, unbiased review.

21.     In addition, an impartial arbitrator was required because Mr. Peterson's appeal concerned NFL Executive Vice President Troy Vincent's representations to Mr. Peterson that the New Policy could *not* be applied to him and that he would be suspended for only two games as that was the applicable maximum discipline at the time.

22.     Mr. Vincent's statements to Mr. Peterson further evidenced the fact that the Commissioner ultimately decided to punish Mr. Peterson more harshly because he had exercised his rights as a union member and declined to attend a pre-disciplinary hearing with NFL advisors on domestic violence, which is not provided for in the CBA and had not taken place in any prior player disciplinary proceeding.  This too put Commissioner Goodell's and Mr. Vincent's conduct at issue in the arbitration, and no person with strong connections to Commissioner Goodell and the NFL could pass the governing evident partiality test under the circumstances.   Indeed, this is precisely why the NFL acknowledged in *Rice* that a neutral arbitrator was required and designated Judge Jones.

23.     Having lost *Rice*, however, Commissioner Goodell—wanting to avoid another embarrassing reversal—refused to agree to an impartial arbitrator for Mr. Peterson. Instead, Commissioner Goodell appointed Mr. Henderson—a long-time NFL executive,

10

consultant, and insider with substantial continuing financial ties to the NFL—to serve as Hearing Officer over Mr. Peterson's arbitration appeal. The NFLPA and Mr. Peterson formally requested that Mr. Henderson recuse himself, the NFL opposed the request, and Mr. Henderson denied the recusal motion.

24.     The arbitration hearing was held before Mr. Henderson on December 2 and 4, 2014.

25.     Arbitrator Henderson issued the Arbitration Award on December 12. If this were not such a serious matter, the Award would be viewed as a parody. On the critical issue of Commissioner Goodell's retroactive application of the New Policy, Mr. Henderson had the hubris to ignore the ruling of a former U.S. District Court Judge, sitting as the Article 46 CBA arbitrator, just weeks earlier on this exact question. Mr. Henderson disingenuously tried to circumvent this "law of the shop" by offering the hypothetical view that even *if* Mr. Peterson's punishment had been properly assessed under the Previous Policy, his indefinite suspension would still be upheld. Putting aside that this hypothetical discussion ignores the undisputed fact that two games was the effective maximum suspension for first-time offenders under the Previous Policy, a suspension under the Previous Policy was *not* the discipline that Commissioner Goodell imposed or that Mr. Peterson appealed. The only discipline before Arbitrator Henderson was the punishment of Mr. Peterson under the New Policy, in contravention of the holding in *Rice*.

26.     Further, Mr. Henderson was so desperate to summarily ratify Commissioner Goodell's indefinite suspension that he went so far as to justify the punishment based on wholly unsupported press allegations that Mr. Peterson "similarly beat his other children,

11

and that he had beaten this child on a prior occasion." Ex. 126 (*Peterson* Arb. Award at 5). Such information appears nowhere in the evidentiary record, and was presumably taken by Mr. Henderson from unverified newspaper articles.   More fundamentally, the hypothetical discipline opined on by Mr. Henderson was—once again—***not the discipline that Commissioner Goodell imposed***, which was for a specific (and single) incident of corporal punishment that was the subject of criminal proceedings.

27.    Mr. Henderson also had the gall to state that the unprecedented discipline of Mr. Peterson could be sustained, again because of newspaper reports, from which he concluded that Mr. Peterson had no remorse for having injured his child and no intention to change his behavior in the future.   Ex. 126 (*Peterson* Arb. Award at 8).   In truth, Arbitrator Henderson knew that Mr. Peterson had told him at the hearing that he was, in fact, very sorry for having injured his son, that he had learned from his mistake, and that it would never happen again.  Ex. 122 (*Peterson* Hr'g Tr. 133:17-23) (Peterson); *id.* 135:17-136:2.  The fact that Arbitrator Henderson dismissed what Mr. Peterson actually said in favor of unverified and out-of-context news reports speaks volumes about his evident partiality.

28.    For all of the reasons set forth below, the Arbitration Award cannot stand even under the limited judicial review of labor arbitration awards.

29.    ***First***, the Arbitration Award must be set aside based on its affirmation of Commissioner Goodell's retroactive application of the New Policy to Mr. Peterson's conduct, which conduct occurred more than three months *before* the New Policy was implemented.  The Award thus departs from the "essence of the CBA" insofar as Judge

Jones specifically ruled in *Rice* that the New Policy could not be retroactively applied, which became "law of the shop" and part of the CBA. *See Trailways Lines, Inc. v. Trailways, Inc. Joint Council*, 807 F.2d 1416, 1426 (8th Cir. 1986) (affirming vacatur because the "Award did not draw its essence from the agreement"); *see also United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 38 (1987); *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 581-82 (1960); *United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597 (1960).

30.    The Award must also be overturned on the related legal ground that Mr. Henderson exceeded his authority as an arbitrator under the CBA. *Doerfer Eng'g, a Div. of Container Corp. of Am. v. N.L.R.B.*, 79 F.3d 101, 103 (8th Cir. 1996). He did so by sustaining the Commissioner's indefinite suspension on grounds contrary to the discipline that was actually imposed—most significantly, by assessing the discipline under the Previous Policy when Commissioner Goodell specifically suspended Mr. Peterson through retroactive application of the New Policy.

31.    The Arbitration Award must also be set aside on the independent legal ground that retroactive application of the New Policy violated the most basic notions of fundamental fairness and consistency of treatment, which governs the enforceability of all arbitration awards under both the Labor Management Relations Act and the Federal Arbitration Act. *See., e.g., El Dorado Sch. Dist. No. 15 v. Cont'l Cas. Co.*, 247 F.3d 843, 848 (8th Cir. 2001) (An error in an arbitrator's determination requires vacatur when it "is not simply an error of law, but . . . so affects the rights of a party that it may be said that he was deprived of a fair hearing."); *see also, e.g., Tempo Shain Corp. v. Bertek, Inc.*, 120

13

F.3d 16, 20-21 (2d Cir. 1997) (reversing district court and vacating arbitration award on grounds of "fundamental unfairness and misconduct" of arbitration panel); *Kaplan v. Alfred Dunhill of London Inc.*, No. 96 Civ. 0258(JFK), 1996 WL 640901, at \*7 (S.D.N.Y. Nov. 4, 1996) (vacating arbitration award because "[t]he deference due an arbitrator does not extend so far as to require a district court to countenance, much less confirm, an award obtained without the requisites of fairness or due process").

32.      ***Second***, the Arbitration Award must be vacated because Mr. Henderson was evidently partial. *Commonwealth Coatings Corp. v. Cont'l Cas. Co.*, 393 U.S. 145, 147, 150 (1968); *Olson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 51 F.3d 157, 159 (8th Cir. 1995). Commissioner Goodell's testimony in *Rice*, his conduct in handling the *Peterson* discipline under intense public pressure and calls for his resignation, and Mr. Vincent's statements to Mr. Peterson, were all central issues in the arbitration. Thus, unlike in the normal Article 46 appeal where it is only the player's conduct at issue, Mr. Henderson was put in the position of ruling as an arbitrator on the conduct of NFL Executives to whom he is closely connected. No NFL insider—let alone Mr. Henderson, the long-time NFL Executive who was the management executive in charge of labor relations with the players for over a decade—could satisfy the evident partiality test under the particular circumstances of this proceeding. *See Williams v. Nat'l Football League*, 582 F.3d 863, 885 (8th Cir. 2009) (evident partiality will be found where an arbitrator did not reveal information that "*objectively* demonstrate[s] such a degree of partiality that a reasonable person could assume that the arbitrator had improper motives"); *Olson*, 51 F.3d at 159 (vacating arbitration award where arbitrator's "substantial interest" in company that

did "more than trivial business" with party to arbitration "create[d] an impression of possible bias"). While Mr. Henderson's evident partiality was known, it was not consented to by the NFLPA or the player for a proceeding in which the conduct of Commissioner Goodell and Mr. Vincent were in question.

33.    *Third*, the Arbitration Award fails to draw its essence from the CBA for the additional reason that it sustains discipline by Commissioner Goodell that was not collectively bargained for and not authorized by the CBA. Among other things, the Arbitration Award sustains Commissioner Goodell's discipline even though it: (i) required Mr. Peterson to have his future professional treatment determined by *NFL-selected* doctors and consultants, a disciplinary measure *prohibited* by the CBA; and (ii) sentenced Mr. Peterson to summary exile on the Commissioner's Exempt List with *no* disciplinary process and no CBA basis or precedent. Commissioner Goodell had no CBA authority for any of these actions—he was just making up the rules as he went along, and an evidently partial arbitrator rubber-stamped the *ultra vires* process and punishment.

34.    For any one or all of these reasons, the Arbitration Award must be vacated under the LMRA and FAA, resulting in the immediate reinstatement of Mr. Peterson, who has already served far more than the two-game maximum suspension applicable under the Previous Policy.

35.    The NFLPA and Mr. Peterson do not seek any discovery in this proceeding. The arbitration record will speak for itself, and this Petition is ripe for final adjudication.

36.     Because Mr. Peterson suffers irreparable harm each day the Arbitration Award remains in place, the NFLPA and Mr. Peterson have concurrently filed a Motion to Expedite, requesting an expedited briefing and hearing schedule.

## JURISDICTION AND VENUE

37.     This Petition to Vacate is submitted pursuant to Section 301 of the LMRA, 29 U.S.C. § 185, and Subsections 10(a)(2), (3), and (4) of the FAA, 9 U.S.C. § 10(a)(2)-(4). This Court has subject matter jurisdiction in this action pursuant to 28 U.S.C. § 1331.

38.     The Minnesota Vikings, one of 32 NFL franchises, is headquartered in Eden Prairie, Minnesota and does business in this District.  The NFL derives revenue from advertising, ticket sales, merchandising, and broadcast revenue throughout the State of Minnesota and is subject to personal jurisdiction here.

39.     Venue is proper in this court under 28 U.S.C. § 1391 and 29 U.S.C. § 185, as the NFL regularly transacts business in this District.

## PARTIES

40.     Petitioner NFLPA is a non-profit corporation duly organized and existing under the laws of the Commonwealth of Virginia and is the union and exclusive collective bargaining representative of all present and future NFL players, including Mr. Peterson. The NFLPA's offices are located at 1133 20th Street, N.W., Washington, D.C. 20036.

41.     Adrian Peterson is a professional football player, a former NFL Most Valuable Player, and a member of the NFLPA.  Mr. Peterson was selected in the first round of the 2007 NFL Draft by the Minnesota Vikings and has played for the franchise for his entire career.  He resides in Eden Prairie, Minnesota.

42.     Respondent NFL maintains its offices at 345 Park Avenue, New York, New York, 10154 and is an unincorporated association consisting of 32 separately owned and operated professional football franchises.

43.     Respondent National Football League Management Council ("NFLMC") is the exclusive bargaining representative of all present and future employer member franchises of the NFL, including the Minnesota Vikings.

## RELEVANT NON-PARTIES

44.     Roger Goodell is the Commissioner of the NFL and serves as the League's chief executive officer.

45.     Harold Henderson is a former NFL executive who worked directly for the League Office from 1991 through 2012.  During his NFL tenure, Mr. Henderson spent sixteen years as the NFL's Executive Vice President for Labor Relations and as Chairman of Respondent NFLMC's Executive Committee.  In this capacity, he was one of the principals responsible for all NFL labor policies, including collective bargaining against the NFLPA. Mr. Henderson subsequently became the League's Executive Vice President for Player Development, and he currently serves as president of the NFL Player Care Foundation.  From 2009 to 2012 alone, Mr. Henderson received more than $2.5 million in compensation from the NFL.  He maintains an NFL email address.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

**I.   ARBITRATION UNDER THE NFL COLLECTIVE BARGAINING AGREEMENT**

46.   The parties are bound by the Collective Bargaining Agreement negotiated between the NFLMC, on behalf of the NFL member teams, and the NFLPA, on behalf of all NFL players.  The current Collective Bargaining Agreement was signed on August 4, 2011 ("CBA").

47.   The CBA sets forth a comprehensive arbitration system with different procedures and arbitrators depending upon the nature of the dispute.

48.   Article 46 of the CBA provides the Commissioner with the authority to impose discipline on NFL players for "conduct detrimental" to the League.  Ex. 1 (CBA, Art. 46, § 1(a)).

49.   In Paragraph 15 of the Standard NFL Player Contract, which is collectively bargained and part of the CBA, players agree that "the Commissioner will have the right, but only after giving Player the opportunity for a hearing at which he may be represented by counsel of his choice, *to fine Player in a reasonable amount; to suspend Player for a certain period or indefinitely; and/or to terminate this contract.*"  Ex. 1A (Standard Player Contract ¶ 15) (emphasis added).  Thus, the Commissioner's authority to punish is limited to fines, suspensions, and terminating contracts—he has no CBA authority to impose discipline in any other form.

50.   The NFL has historically provided notice to NFL Players as to what type of conduct would be considered conduct detrimental by the Commissioner, and information

about purported changes in the level of future discipline, before such disciplinary policies would be applied. This notice was provided in various iterations of what the NFL has entitled the "Personal Conduct Policy." While the Personal Conduct Policy must, as applied to NFL players, comply with the CBA, it has provided notice of changes in NFL disciplinary policies, which is an essential requirement of fundamental fairness and industrial due process that applies to all labor agreements.

51.     Players have the right, under Article 46 of the CBA, to appeal the imposition of conduct detrimental discipline, with the CBA providing that either the Commissioner or his designated Hearing Officer may serve as arbitrator of that appeal after consulting on the selection of the arbitrator with the Executive Director of the NFLPA. Ex. 1 (CBA, Art. 46, §§ 1(a), 2(a)).

52.     While the NFLPA agreed the Commissioner or his designee could serve as the arbitrator for Article 46 discipline appeals, the NFLPA did not agree to such arbitrators when the conduct of NFL executives is at issue, rendering the Commissioner or other NFL arbitrators to be evidently partial in violation of federal law.

53.     Article 46 also specifies the arbitration appeal process and hearing, as follows:

> For [conduct detrimental] appeals . . . the Commissioner shall, after consultation with the Executive Director, appoint one or more designees to serve as hearing officers. . . . In any hearing provided for in this Article, a player may be accompanied by counsel of his choice. The NFLPA and NFL have the right to attend all hearings provided for in this Article and to present, by testimony or otherwise, any evidence relevant to the hearing.

*Id.* § 2(a)-(b). Further, Article 46 provides for the exchange of specified discovery in advance of an appeal hearing. *Id.* § 2(f)(ii).

54.     It is the "law of the shop," as held by CBA arbitrators, that Players' arbitration appeals of Commissioner discipline under Article 46 must comport with principles of fairness and consistency. Ex. 119 (*Rice* Appeal Decision, slip op. at 8) ("discipline under [Article 46] must be fair and consistent"); Ex. 36 (*Bounty* Final Decision on Appeal, slip op. at 19, 21)(applying "standard[s] grounded in common sense and fairness" and vacating player discipline for "not satisfy[ing] basic requirements for consistent treatment of player-employees similarly situated"). That is, the arbitrator—even when it is Commissioner Goodell himself—does not have *carte blanche* as to how he will conduct the proceedings or the standards of review that must be applied to the discipline imposed. Rather, he must abide by well-established arbitral standards which require fundamental fairness and adherence to the CBA. *See, e.g., Enterprise Wheel*, 363 U.S. at 597; *see also Misco*, 484 U.S. at 38; *El Dorado Sch. Dist. No. 15.*, 247 F.3d at 848; *PSC Custom, LP v. United Steel Int'l Union, Local No. 11-770*, 763 F.3d 1005, 1009 (8th Cir. 2014); *Tempo Shain*, 120 F.3d at 20-21.

55.     Further, it is well established that even though Article 46 permits the Commissioner or his designee to serve as the arbitrator, this is not the case when the conduct of the Commissioner himself is at issue in the arbitration, as the governing legal standards precluding an evidently partial arbitrator apply in such a case. *See, e.g., Morris v. N.Y. Football Giants*, 575 N.Y.S.2d 1013, 1016-17 (N.Y. Sup. Ct. 1991) (holding that, under circumstances of case, NFL Commissioner sitting as arbitrator had to be replaced by

neutral arbitrator pursuant to federal and state arbitral law); *Erving v. Virginia Squires Basketball Club*, 468 F.2d 1064, 1068 n.2 (2d Cir. 1972) (affirming substitution of neutral arbitrator for professional basketball Commissioner under FAA "in order to insure a fair and impartial hearing").

## II. THE NFL COMES UNDER FIRE FOR ITS HANDLING OF INCIDENTS OF DOMESTIC VIOLENCE AND CHANGES ITS POLICY

### A. The NFL and Commissioner Goodell Are Subjected to Withering Criticism for Their Historical Treatment of Acts of Domestic Violence

56.　In July 2014, Ray Rice, a player on the Baltimore Ravens, was punished for an incident of domestic violence involving his then-fiancée. He received a two-game suspension without pay, plus a one-game fine, which, as described below, was then the maximum punishment for an act of domestic violence committed by a first-time offender of any NFL disciplinary policy.

57.　Thereafter, Commissioner Goodell faced seething criticism and calls for his removal based on widespread public opinion that the NFL's domestic violence policies were too lenient *See, e.g., Ray Rice: Roger Goodell Gives Wrist Slap to a Wife Beater*, Twin Cities (July 25, 2014) ("[T]o maintain any sense of credibility, at a minimum [Commissioner Goodell] and the NFL ought to be bound by a discernible moral code, and by limiting Rice's suspension to two games, they are establishing a twisted hierarchy of values with respect to what they consider to be acceptable behavior.")[2]; *NFL Doesn't Take*

---

[2] http://www.twincities.com/sports/ci_26215045/ray-rice-roger-goodell-gives-wrist-slap-wife.

*Spousal Abuse Seriously*, MINNEAPOLIS EXAMINER (July 29, 2014) ("When the NFL announced that it was suspending Ray Rice for 2 games for knocking his then-fiancée out, they sent the unmistakable message that they don't take spousal abuse seriously.")[3]; Ex. 41 (*Roger Goodell, NFL Dropped Ball Throughout Ray Rice Process*, THE WASHINGTON POST (July 29, 2014))("Most of America is rightly furious that . . . [Ray Rice] was suspended a mere two games by a tone-deaf commissioner."); Ex. 38 (*Here's How Poorly the NFL Did in Its Punishment of Ravens RB Ray Rice*, YAHOO! SPORTS (July 24, 2014)) ("Let's look at the more sinister problem here: the fact that the NFL's authority figures are meek when it comes to violence against women.").

58.     Commissioner Goodell faced a procession of public calls for his resignation. *See, e.g.*, Ex. 46 (*Keith Olbermann calls for NFL [C]ommissioner Roger Goodell to resign*, USA TODAY (Aug. 2, 2014))("Olbermann argues that Goodell's failure to properly set a new precedent with Rice's case is the last straw."); Ex. 42 (*Is Goodell Good Enough to Lead the NFL?* NPR (July 30, 2014)) ("[The NFL] need[s] a leader of grace and vision. More and more, Roger Goodell just looks like a slick, selling us 76 trombones."); Ex. 45 (*Shot From the Hip: Goodell is no good for NFL*, SIFTINGS HERALD (Aug. 1, 2014)) ("Goodbye, Mr. Goodell.  It's time to go home now."); Ex. 48 (*It's Time For Roger Goodell To Resign*, ESQUIRE (Aug. 28, 2014)) ("It's time for Roger Goodell to stop being the [C]ommissioner of the NFL.").

---

[3] http://www.examiner.com/article/nfl-doesn-t-take-spousal-abuse-seriously.

59.     Initially, however, Commissioner Goodell and the NFL correctly defended the two-game suspension of Mr. Rice because it had been consistent—as it was legally required to be—with the League's past disciplinary practice, by which the League was legally bound under established tenets of labor law. *See, e.g.*, *Roger Goodell defends Ray Rice ban*, ESPN (Aug. 2, 2014) (quoting Goodell as stating that: "We have to remain consistent. We can't just make up the discipline. It has to be consistent with other cases, and it was in this matter."); Ex. 39 (*An NFL Executive Failed Miserably When Trying to Explain The Length of Ray Rice's Suspension*, SPORTS NEWS INTERNATIONAL (July 28, 2014)) (NFL Senior Vice President of Labor Policy & Government Affairs, Adolpho Birch) ("[W]e are bound in large part by precedent in prior cases, decisions that have been heard on appeal in the past, and notions of fairness and appropriateness. . . ."); *id.* (Birch) ("[T]he reality is that we have to make decisions that are fair and consistent with both the prior case law and the prior precedent, but also the message that we need to send as a league to ensure that people understand the standards of conduct expected of them.").

60.     Indeed, in *Rice*, it was conceded that no prior first-time offender of the domestic violence policy had ever received more than a two-game suspension and, to be fair and consistent with Mr. Rice, who had no notice of a change in the disciplinary policy, the same standard had to apply. █████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████

███████████████████████████████████

████████████████████████████ *see also* Ex. 119 (*Rice*

*Appeal Decision*, slip op. at 5 & n.4) (finding that "[n]o prior domestic violence cases

reviewed by [the Commissioner] had resulted in discipline of more than two games" and

permitting only a two-game suspension to stand).

## B.   The Commissioner Declares his Prior Disciplinary Policy and Decisions to Have Been a "Mistake"

61.   Eventually, the overwhelming criticism of the NFL's domestic violence

policy—from fans, corporate partners, media, and the public at large—became too much

for the NFL and Commissioner Goodell.  In a letter to NFL owners on August 28, 2014,

Commissioner Goodell said he had failed to "get it right" when it came to punishing

domestic violence, historically and in the case of Mr. Rice, and he announced an overhaul

of the NFL's Previous Policy and practices in disciplining acts of domestic violence:

> We allowed our standards to fall below where they should be and lost an important opportunity to emphasize our strong stance on a critical issue and the effective programs we have in place.  My disciplinary decision led the public to question our sincerity, our commitment, and whether we understood the toll that domestic violence inflicts on so many families.  I take responsibility both for the decision and for ensuring that our actions in the future properly reflect our values.  I didn't get it right. Simply put, we have to do better.  And we will.

*See* Ex. 3 at 3 (Aug. 28, 2014 Goodell Ltr. to Owners).

62.   Commissioner Goodell's subsequent public statements likewise criticized

what had been his prior disciplinary policies and practices with respect to domestic

violence and made it clear that it was the Previous Policy—applicable to all players at the time of Mr. Rice's and Mr. Peterson's conduct—that was the problem:

- "I got it wrong on a number of levels—from the process I led to the decisions that I reached. But now I will get it right . . . ." Ex. 64 at 0483 (*Sept. 19 Press Conference Opening Statement on Domestic Violence and the NFL*, KHBS (Sept. 20, 2014)).

- "We went through the process and we disciplined it consistent with [the Previous] [P]olicy. That wasn't sufficient, as I said. That was a mistake." Ex. 65 at 0489 (*Roger Goodell, Q & A Following Press Conference Regarding Domestic Violence in the NFL*, KSPR (Sept. 20, 2014)).

- "I'm not satisfied with the process we went through, I'm not satisfied with the conclusions. And that's why we came out last month and said: we're going to make changes to our policies. We made changes to our discipline. We acknowledge the mistake, my mistake. And we said we're going to do better moving forward." *Id.* at 0486.

- "[W]e do not have a clear and consistent policy that allows us to deal with all of the different issues that are arising and that's why we talked last month about 'we need to change our policies.'" *Id.* at 0487.

- "I think the policy itself was, again, not up to standards. The standard discipline for that was way below what it should be." *Id.* at 0489.

63.     The Commissioner promised to correct his "mistake" by getting tough with players under his New Policy—vowing to "do whatever is necessary" to "get it right" and rehabilitate the NFL's public image. Ex. 64 at 0483 (*Sept. 19, 2014 Press Conference Opening Statement on Domestic Violence and the NFL*, KHBS (Sept. 20, 2014)).

25

## C.   The New Policy

64.    On August 28, the Commissioner unilaterally announced the New Policy, *i.e.*, that Policy was not collectively bargained with the NFLPA.[4]  The New Policy provided for a presumptive suspension of six games for first-time domestic violence offenders, which could be adjusted upwards in certain circumstances.  Under the Previous Policy, no such presumptive penalty existed.  To the contrary, the prior history of discipline under the Previous Policy, and the  legal requirement to be fair and consistent to each player, established the rule that first-time offenders were suspended for no more than two games.

65.    Through the New Policy, Commissioner Goodell further purported to be able to require players to subject themselves to "mandatory evaluation and . . . counseling or other specialized services" if one of the NFL's newly-appointed medical advisors recommends such treatment.  *See* Ex. 3 at 3 (Aug. 28, 2014 Goodell Ltr. to Owners).  Although Article 46 of the CBA and the NFL Player Contract state that the Commissioner may impose suspensions and fines for conduct detrimental, there is no provision authorizing the Commissioner to dictate the terms of counseling that a player may (or may not) choose to undergo as part of any disciplinary process or otherwise.  *See generally* Ex. 1 (CBA, Art. 46); Ex. 1A (Standard Player Contract ¶ 15).

---

[4] Although the validity of the New Policy under the CBA and labor law is not an issue before the Court, the NFLPA expressly reserves all rights to challenge the New Policy, which was not collectively bargained.  This issue is not before the Court because it is clear that the New Policy could not be retroactively applied to Mr. Peterson's conduct in this case.

**D.** **Commissioner Goodell Testifies in *Rice* that the New Policy Could Not Be Applied Retroactively**

▌As Judge Jones held, Commissioner Goodell was well aware that retroactive, or *ex post facto*, punishment deprives players of notice of potential discipline and is thus impermissible. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████

██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████

Ex. 35 (*Rice* Hr'g Tr. 99:21-100:15) (Goodell) (emphasis added); *see also* Ex. 119 (*Rice* Appeal Decision, slip op. at 7).

67.     Commissioner Goodell similarly testified in *Rice* that he did not consider changing Mr. Rice's discipline when the New Policy was issued ████████████████

████████████████████████████████████████████

▌█████     Ex. 35 (*Rice* Hr'g Tr. 101:7-13) (Goodell); *see also* Ex. 119 (*Rice* Appeal Decision, slip op. at 7).

68.     ████████████████████████████████████████

████████████████████████████████████████████



Ex. 35 (*Rice* Hr'g Tr. 191:23-192:8) (Goodell).

69.    Commissioner Goodell further testified: "

" *Id.* 101:18-102:9 (Goodell).

70.    Judge Jones would eventually rule on this point in her decision vacating the second suspension of Mr. Rice, and thus make it the "law of the shop" under the CBA: "*Recognizing that even under the broad deference afforded to him through Article 46, [Commissioner Goodell] could not retroactively apply the new presumptive penalty to Rice*, the Commissioner called Rice to [as]sure him that his punishment would remain unchanged." Ex. 119 (*Rice* Appeal Decision, slip op. at 16).

E.    **The *Rice* Decision Conclusively Established that, Prior to the New Policy, the Binding Past Practice of Maximum Suspension for Acts of Domestic Violence by a First Time Offender Was Two Games**

71.    In line with their public statements concerning Mr. Rice's two-game suspension, Commissioner Goodell and Mr. Birch, the chief NFL lawyer responsible for player disciplinary matters, testified under oath in *Rice* that

. Ex. 35 (*Rice* Hr'g Tr. 164:25-165:6) (Goodell) ("I do accept that I have to be consistent with consistent circumstances . . . I think that's about fairness, and fairness would be you should be as consistent as possible in your discipline,     "); *id.* 112:3-112:9 (Goodell)

████████████████████████████████████████████

████████████████████████████████████████████

███████; *id.* 344:15-345:4 (Birch).

72.     The *Rice* record further established, and Judge Jones expressly found, that past precedent for NFL domestic violence discipline was circumscribed by the fact that "[n]o prior domestic violence cases . . . had resulted in discipline of more than two games" before the NFL implemented the New Policy in August 2014.  Ex. 119 (*Rice* Appeal Decision, slip op. at 5 & n.4).

73.     Commissioner Goodell and Mr. Birch testified that ████████████████

████████████████████████████████████████████

████████████████████████.  Ex. 35 (*Rice* Hr'g Tr. 181:5-24) (Goodell); *id.* 368:5-13 (Birch); *see also id.* 179:12-19 (Goodell).

74.     Although two games was the NFL's historic maximum suspension of first-time domestic violence offenders, an irate general public complained to the NFL that its past practices were inadequate.  Despite being reversed by Judge Jones in the Rice arbitration, Commissioner Goodell has again sought to quell the intense criticism directed at him by striking out with arbitrary and inconsistent player discipline—this time, by reversing course and applying the New Policy retroactively in the case of Mr. Peterson.

### III.   MR. PETERSON'S CRIMINAL PROCEEDING AND SUBSEQUENT NFL DISCIPLINE

####    A.    Mr. Peterson's Criminal Charge Is Resolved

75.    On September 11, following an investigation into child abuse allegations stemming from Mr. Peterson's May 2014 corporal punishment of his son with a switch, a Texas grand jury indicted Mr. Peterson for felony reckless or negligent injury to a child.

76.    Mr. Peterson's indictment became another flashpoint for public criticism of the NFL and Commissioner Goodell.  No less than Minnesota Governor Mark Dayton called for Mr. Peterson's immediate suspension.  Ex. 62 (*Minnesota governor calls for Adrian Peterson's immediate suspension*, SB NATION (Sept. 16, 2014)).  Vikings sponsors threatened the possibility of large-scale economic consequences by expressing their displeasure with the franchise. *See, e.g.*, Ex. 60 (*Radisson Drops NFL Vikings Amid More Peterson Accusations*, BLOOMBERG (Sept. 16, 2014)).

77.    Following wide publication of Mr. Peterson's indictment, the Minnesota Vikings deactivated him for the Club's September 14 game against the New England Patriots.

78.    On September 18, Mr. Peterson entered into an *ad hoc* agreement with the Minnesota Vikings, the League, and the Union, in which he would be placed on the Commissioner's Exempt List, with pay, and not play football until the criminal charges against him were resolved.  Mr. Peterson missed eight games while deactivated or on the Commissioner's Exempt List before his criminal proceedings reached a resolution.  The agreement for Mr. Peterson to be on the Commissioner Exempt List, by its express terms,

only lasted until the criminal proceedings against Mr. Peterson were resolved, at which point the normal CBA rules would apply to Mr. Peterson.

79.    On November 4, 2014, Mr. Peterson pleaded *nolo contendere* to a reduced misdemeanor charge of reckless assault, as part of a plea agreement approved by a Texas state court, in which Mr. Peterson agreed to pay a fine of $4,000, complete 80 hours of community service, and abide by over a dozen other conditions of a two-year period of "community supervision." Ex. 30 at 0181-83 (Deferred Adjudication Judgment & Order at 1-3). In connection with this agreement, the Texas Court issued a deferred adjudication order in which Mr. Peterson's charge will be removed from his record if he satisfies all conditions of his supervision.

80.    With the conclusion of Mr. Peterson's criminal proceedings, there was no longer any agreement in place to keep him on the Commissioner's Exempt List. Indeed, neither the CBA nor the NFL Constitution & Bylaws provides any basis to use the Commissioner's Exempt List or any other device as a "pre-discipline" measure to suspend a player with pay. To the contrary, the NFL Constitution makes clear that the Commissioner's Exempt List is merely a mechanism by which the Commissioner may grant an exemption to a team from counting a signed player against the team's maximum number of Active Players—it has no role as a disciplinary or suspension without pay measure at all. *See* Ex. 124 (NFL Const. & Bylaws, Art. XVII, § 17.14(A)) ("The Exemption List is a special player status available to clubs only in unusual circumstances. [It] includes those players who have been declared by the Commissioner to be temporarily exempt from counting within the Active List limit.").

81.     Despite the absence of any authority under the CBA or the NFL Constitution to do so, Commissioner Goodell immediately punished Mr. Peterson, without the requisite hearing or disciplinary process, by sentencing Mr. Peterson to involuntarily, continued purgatory on the Commissioner's Exempt List after November 4, the date on which he reached a resolution in his criminal proceeding and should have been permitted to return to his team. On November 6, the NFL informed Mr. Peterson that he would remain on the Commissioner's Exempt List until the Commissioner determined Mr. Peterson's discipline, a deadline which was subsequently extended in Mr. Peterson's discipline letter until resolution of any appeal. Ex. 5 at 0013; Ex. 18 at 0036.

82.     This unprecedented measure—an immediate suspension with pay but no disciplinary process—has no collectively-bargained basis; it does not even appear in the NFL's Constitution and Bylaws. Further, there can be no doubt that missing NFL games— even with pay—imposes irreparable harm given the short careers of NFL players. *See, e.g., NFL PA v. NFL (StarCaps)*, 598 F. S upp. 2d 9 71, 98 2 ( D. Minn. 2 008)(Judge Magnuson finding irreparable harm to players due to their suspensions).

83.     On December 10, when the NFL unilaterally announced further revisions to the New Policy, the Commissioner added his unprecedented idea of using the Commissioner's Exempt List for disciplinary purposes in cases of domestic violence during the pendency of criminal proceedings. Putting aside the fact that the December 10 revisions to the New Policy is itself a labor law and CBA violation, there is no conceivable argument that the December 10 revisions to the New Policy—announced after Mr. Peterson's discipline—could somehow be applied to Mr. Peterson. To the contrary, the

revisions punctuate that the NFL is making it up as it goes along, and that there was no CBA basis for Mr. Peterson to have been summarily punished, without any process, by being placed on the Commissioner Exempt List after November 4. As a result of this improper pre-hearing discipline, Mr. Peterson was forced to miss four more games before his indefinite suspension even took effect upon issuance of the Award denying his appeal

> **B.    NFL Executive Troy Vincent, After Conferring With a Group That Included Commissioner Goodell, Specifically Tells Mr. Peterson that He Will Be Punished Under the Previous Policy and Will Only Be Suspended Two Games**

84.    Troy Vincent is a former NFL player, former NFLPA President, and current NFL Executive Vice President of Football Operations.

85.    As the arbitration record establishes, following Mr. Peterson's criminal plea, he and Mr. Vincent discussed his disciplinary situation. These conversations took place over the phone, except for a one-on-one, in-person meeting on November 10 for which Mr. Vincent flew to Houston to speak with Mr. Peterson at his home. Ex. 122 (*Peterson* Hr'g Tr. 218:5-18) (Vincent).

86.    As set forth below, the arbitration record established that Mr. Vincent was speaking to Mr. Peterson about his discipline with the input and knowledge of Commissioner Goodell and the entire discipline advisory committee assembled by the Commissioner, consisting of NFL executives and outside consultants.

87.    The arbitration record includes an audio recording of two November 12 conversations, which have been transcribed and submitted in the arbitration record in disc and transcript form as Exhibits 25-28. Mr. Vincent testified to the authenticity of the audio

recordings and the accuracy of the transcripts during his testimony in the arbitration proceeding.

88.     Mr. Vincent told Mr. Peterson that Commissioner Goodell could not discipline him retroactively under the New Policy because his misconduct had occurred prior to the Policy's existence. Ex. 28 (Nov. 12 Audio Recording 4:23-5:12) (Vincent) (emphasis added) ("[S]o remember this, A.P. . . . today, *you're not subject to the new personal conduct policy. . . . [B]ecause of when this occurred*, . . . they're looking at how they would treat this in the old, like the current policy—not the new, the current."); *see also* Ex. 122 (*Peterson* Hr'g Tr. 194:12-16) (Vincent) ("Q. . . . My question is you were telling him he was not subject to the new Personal Conduct Policy; is that right? A. Yes."). Moreover, Mr. Vincent confirmed under oath his understanding that "the new Personal Conduct Policy would only apply going forward . . . not [to] past behavior." *Id.* 195:19-196:4 (Vincent).

89.     Mr. Vincent also told Mr. Peterson—repeatedly—that he would be subject to *only a two-game suspensi on*, which wa s the  effective maxi mum for a  first -time domestic violence offender, as Judge Jones concluded in the Rice arbitration, Ex. 119 (*Rice Appeal Decision*, slip op. at 5 & n.4), prior to imposition of the New Policy:

- Ex. 27 (Nov. 12 Audio Recording 4:16-19) ("ADRIAN PETERSON: Hmm. So two games? TROY VINCENT: That is if you—but you cannot—you've, you've gotta act—you gotta just go through the process.");
- *Id.* 5:10-12 ("ADRIAN PETERSON: Mm hmm. That I get the two games? Um . . . TROY VINCENT: Yeah. ADRIAN PETERSON: So basically two game checks. TROY VINCENT: Um, I'm not sure what the actual—but I think they were talking about potentially having you come back and that two

games, now this is the two games, one would be—that includes this weekend.");

- *Id.* 6:15-17 ("This is just [this week and] next week, with the ability for you to be able to go back [with your club] on, um, on Tuesday.") (Vincent);

- Ex. 28 17:1-6 ("ADRIAN PETERSON: Yeah. Okay. Because my biggest thing now is just those, you know, missing this week and then, you know, missing next week, you know . . . TROY VINCENT: Yeah, but please don't share that with anybody."); and

- *Id.* 17:17-18:2 ("It was really like this weekend and next weekend.") (Vincent):

90.     Mr. Vincent even went so far as to identify for Mr. Peterson the specific two games for which the League planned to suspend him—those games played by the Vikings on November 16 and 23.  Ex. 27 (Nov. 12 Audio Recording 4:16-19, 5:20-6:17) ("ADRIAN PETERSON:  Oh, so it, it'll be two additional games, not get time served. TROY VINCENT:  No, no, no, no, no, no, no.  No.  It will—The one this weekend. ADRIAN PETERSON:  Mm.  TROY VINCENT:  So really it's just next week and you, you, you, you, you, you're rolling, you're back."); Ex. 28 (Nov. 12 Audio Recording 17:22-18:10) (Vincent) ("That wasn't discussed that you're going to miss like two like that.  It was really like this weekend and next weekend.").  Mr. Vincent confirmed at the hearing that he conveyed this specific message to Mr. Peterson on November 12: "Q. So what was being considered then was that he might get back to his team as soon as the next Tuesday when it is the day you can join to start practicing, right? A. Yes." Ex. 122 (*Peterson* Hr'g Tr. 178:7-17) (Vincent).

91.     Furthermore, Mr. Vincent expressed to Mr. Peterson that the NFL believed he had already "paid the price" for his conduct and that, accordingly, his time on the Commissioner's Exempt List prior to November 4 would be factored into any discipline

the NFL would impose. Ex. 27 (Nov. 12 Audio Recording 5:20-23) (Vincent); *id.* 12:10-17 (Vincent); *id.* 15:21-16:7 (Vincent); Ex. 28 (Nov. 12 Audio Recording 5:24-6:5) (Vincent); *id.* 6:23-8:4 (Vincent); *id.* 14:10-15:4 (Vincent); Ex. 122 (*Peterson* Hr'g Tr. 224:17-225:14) (Vincent).[5]

92.    In discussing with Mr. Peterson the importance of getting him time served and no more than a two-game suspension, Mr. Vincent cited the limited window that NFL players have in which to leverage their youth, athleticism and talent during their careers. Mr. Vincent asserted that this was a concern in Mr. Peterson's case because, even though Mr. Peterson was receiving compensation while on the Commissioner's Exempt List, he was "not participating"—to his detriment—in any football games, practices, team meetings or activities. Ex. 28 (Nov. 12 Audio Recording 5:24-6:5)(Vincent) ("[A]s a ball player, you know, there's shelf life. The body has shelf life."). Mr. Vincent also admitted this was a particular concern for a future Hall of Fame player like Mr. Peterson, who was irreparably damaged by every game he could not play in and continue to build upon his record-breaking career. Ex. 122 (*Peterson* Hr'g Tr. 205:9-206:20).

---

[5] *See also* Ex. 73 (*NFL's Divide with Players' Union Grows in Peterson Case*, USA TODAY (Nov. 18, 2014)) ("Vincent acknowledges it was [he] who told Peterson that time away would be considered when weighing additional discipline . . . ."); *accord* Ex. 74 (*Troy Vincent Admits Mentioning "Time Served" to Peterson, Disputes Context*, PRO FOOTBALL TALK (Nov. 19, 2014)) ("[Vincent] admits telling Peterson that time served while suspended with pay would be considered, but . . . only if Peterson showed up for last Friday's meeting . . . ."); Ex. 75 (*NFLPA Chief Says Adrian Peterson Suspension Will Be Decided in Court,* Pioneer Press (Nov. 19, 2014)) ("NFL spokesman Brian McCarthy did not deny Vincent's statement . . . . 'The time he missed on paid leave was taken into account in the discipline,' said McCarthy.").

93.     Mr. Peterson understood—correctly—that Mr. Vincent was speaking on behalf of Commissioner Goodell during their conversations, because he repeatedly asked Mr. Vincent to convey their discussions to the Commissioner, *see, e.g.*, Ex. 28 (Nov. 12 Audio Recording 15:5-11) (Peterson), and Mr. Vincent responded that he could and would do so. *E.g., id.* 18:7-10 (Vincent); *see also id.* 18:12-15 (Mr. Vincent characterizing the source of his information as "my group, the group, um, that's been, you know, just kind of there talking"). Mr. Vincent testified that his representations to Mr. Peterson about the upcoming suspension and disciplinary process were made *after* he had discussed those details with the "group" he was meeting with to discuss Mr. Peterson, which included Commissioner Goodell, NFL attorneys, and the NFL's newly-imposed outside "expert" "consultants" and "advocates."[6]

- Ex. 27 (Nov. 12 Audio Recording 11:3-20) (Vincent) (emphasis added): "[T]omorrow I'll have better clarity—the game checks, the, the fine piece, *they didn't give me that tonight* with, with detail. It was 'If there was any further possible suspension what should that be?'"; *id.* 12:2-17: "So I can't give you any answer tonight [on the fines] but tomorrow I can definitely . . . find that out . . . so that you have some kind of indication."

---

[6] This point is further supported by the fact that when Mr. Vincent had *not* gotten the NFL's input on an issue Mr. Peterson asked him about, he would defer his response until he had a chance to speak to the NFL discipline advisory committee. *See, e.g.*, Ex. 28 (Nov. 12 Audio Recording 18:3-10) ("ADRIAN PETERSON: Yeah, yeah, that's what I'm saying. This weekend and next weekend, instead of—instead of missing next weekend, what about just a game check? TROY VINCENT: I'm not—I don't know. That didn't—That again, it was brief. That part didn't come up, but I can—I'll throw that out tomorrow just to see how the y respond."); *see also* Ex. 27 (Nov . 12 Audio Recor ding 11:3 -6) (Vi ncent) (emphasis added) ("[T]omorrow I'll have better clarity—the game checks, the, the fine piece, *they didn't give me that tonight* with, with detail."); *id.* 12:2-17 ("So I can't give you any answer tonight [on the fines] but tomorrow I can definitely. . . .").

- Ex. 122 (*Peterson* Hr'g Tr. 161:14-162:4)(Vincent): "Q. . . . [W]hat I am asking is who in the League were you talking to about the information you were giving to Adrian in your discussions after November 4th or 5th? In other words, you were talking to someone in the League. Were you talking to all of those people about your discussions with Adrian? Were they consultants? The advocates? The other people? A. Yes, sir. Q. So, did you all get together and meet? A. We were meeting daily, yes, sir."

- *Id.* 167:19-168:21 (Vincent): "Q. . . . [D]id you share with people in the League that Adrian had said one game or two games? A. Yes. Q. Who did you share that with? . . . A. That was with the broader group, that was with the advocates. That was with our advisors. It was twenty, twenty-five people. Q. Was Adolpho Birch part of the people you shared that with? A. Yes, Adolpho was in the room. Q. Was anyone else from the legal department in the room? Mr. Manara? A. Kevin—yes, Kevin might have been present. . . . Q. Was Roger Goodell in that room? A. Yes. Q. So Roger Goodell was one of the people in the room who you shared Adrian's view about the two games? A. Yes."

*See also id.* 214:9-215:14 (Vincent).

94.    Throughout these conversations, Mr. Vincent stressed the importance of Mr. Peterson's attendance at an upcoming November 14 disciplinary "hearing" scheduled by Commissioner Goodell. *See* Ex. 122 (*Peterson* Hr'g Tr. 164:20-166:8, 178:12-17); Ex. 27 (Nov. 12 Audio Recording 3:7-10, 4:10-19, 7:24-8:7); Ex. 28 (Nov. 12 Audio Recording 7:19-8:1, 17:8-13). Indeed, as the NFL's counsel put it at the arbitration hearing: "All Mr. Vincent did was try to get [Mr. Peterson] to attend [the November 14 hearing]." Ex. 122 (*Peterson* Hr'g Tr. 14:7-16) (Nash).

**C.     NFL Executives Demand that Mr. Peterson Appear at an Unprecedented, Non-Collectively-Bargained "Hearing" with NFL Lawyers and Outside "Consultants"**

95.     On November 11, the NFL demanded that Mr. Peterson attend a pre-disciplinary "hearing" on November 14, Ex. 6, which it later revealed would involve the presence and participation of "outside people," including a former prosecutor, a psychiatrist, a former NFL General Manager, and a former NFL player. Ex. 10. The NFL would not provide Mr. Peterson and the Union information about the roles of these individuals other than to identify them as "experts" to consult with the NFL and "broaden [its] perspective." *Id.*

96.     In addition to these written demands, the NFL had Mr. Vincent attempt to persuade Mr. Peterson to attend the November 14 "hearing," which Mr. Vincent did by way of multiple phone calls and even a trip to Texas to speak to Mr. Peterson in person. *See supra* SOF III.B.

97.     The undisclosed roles of the new, unilaterally-imposed outside consultants, and the NFL's reference to unprecedented hearing procedures, prompted Mr. Peterson's union, *i.e.*, the NFLPA, to send several letters and emails to the Commissioner and NFL counsel in an attempt to obtain critical information about Mr. Peterson's unprecedented disciplinary process. *See* Exs. 7, 9, 12, 15, 17.

98.     Mr. Vincent himself acknowledged in his testimony that this "hearing" was unprecedented and inconsistent with past practice although he nonetheless attempted to persuade Mr. Peterson to attend it. Ex. 122 (*Peterson* Hr'g Tr. 210:15-20, 211:9-16, 212:8-213:11) (Vincent).

39

99.    Mr. Peterson refused to attend this hearing but he did request, through the NFLPA, the customary disciplinary meeting with the Commissioner, pursuant to the parties' long-standing CBA practice so he would have an opportunity to tell his side of the story prior to the imposition of any discipline. *See* Exs. 11, 12, 16.  Despite this request, the Commissioner never met with Mr. Peterson, choosing to rely on newspaper reports and other written documents, rather than hearing from the player himself.

### D.    The NFL Suspends Mr. Peterson for "At Least the Remainder of the 2014 Season" and Sets No Date for Reinstatement

100.   On November 18, Commissioner Goodell sent a letter to Mr. Peterson (the "Discipline Letter"), in which he suspended Mr. Peterson, a first-time offender of any NFL Policy, without pay for "at least the remainder of the 2014 season," which at that time was six games. Ex. 18 (Discipline Ltr. at 3).  There is no definitive end to the suspension, and Mr. Peterson's status will not even be reconsidered until April 15, 2015—six weeks after the start of the free agency period, when the Commissioner knows it will be much harder for Mr. Peterson to obtain a favorable contract with teams who have already filled their need for a running back in the event the Vikings terminate Mr. Peterson's contract.

101.   Moreover, the Commissioner conditioned the length of Mr. Peterson's suspension on his participation in an unprecedented mandatory "counseling and treatment" program, designed and administered by a psychiatrist of the NFL's own choosing. *See id* at 3-4.  In order to "assess [Mr. Peterson's] progress going forward," the Commissioner wrote that he would set up "periodic reviews" with him, the first of which would not be until April 15, 2015. *Id.* at 4.  At the eventual arbitration hearing, counsel for the NFL

argued that the Commissioner believes Mr. Peterson's chosen therapist is somehow inadequate because she is a clinical psychologist as opposed to a psychiatrist, and even went so far as to suggest that the NFL should have a hand in choosing a counselor for Mr. Peterson's *child.* Ex. 122 (*Peterson* Hr'g Tr. 79:23-82:5) (Nash).  The CBA provides the Commissioner with no such omnipotence or authority—to the contrary, the collectively-bargained NFL Player Contract limits Commissioner discipline to fines, suspensions, and/or termination of the contract. Ex. 1A (Standard Player Contract ¶ 15).

102.   Doing the exact opposite of what he testified (and Judge Jones held) to be prohibited in *Rice*, Commissioner Goodell expressly stated in the Discipline Letter that he had assessed Mr. Peterson's discipline ***pursuant to the New Policy***, which was announced more than three months after Mr. Peterson's conduct occurred. Ex. 18 (Discipline Ltr. at 2-3) ("The modifications to the Personal Conduct Policy that were announced on August 28 establish a baseline discipline of a suspension without pay for six games for certain offenses, including a first offense of assault, battery, or domestic violence.   That announcement also identified several aggravating circumstances that would warrant higher levels of discipline.  A number of those circumstances are present here.").

103.   The Discipline Letter also continued Mr. Peterson's involuntary servitude on the Commissioner's Exempt List pending any exercise of his right to an arbitral appeal—thus punishing him further for exercising that right.

104.   It is apparent from the drastic increase in Mr. Peterson's discipline—compared to that which Mr. Vincent represented to him would be imposed (two games under the Previous Policy and consideration of time served on the Exempt List)—that

41

Commissioner Goodell arbitrarily increased the punishment to Mr. Peterson not only to quell public criticism but also to punish Mr. Peterson for exercising his union rights not to attend a pre-disciplinary hearing with outside League advisors that is not provided for in the CBA and did not comport with the parties' long-term custom and practice regarding pre-disciplinary meetings between the Commissioner, NFL staff, and players who face discipline by the Commissioner. Indeed, the Discipline Letter itself contains three full paragraphs conveying the Commissioner's stated displeasure that Mr. Peterson did not come to the November 14 hearing.

105. The Commissioner also wrote that Mr. Peterson's punishment was based on his supposed lack of remorse for injuring his son, based on the Commissioner's selective interpretation of Mr. Peterson's public comments, but *without* giving Mr. Peterson his requested opportunity to meet with the Commissioner directly. As Mr. Peterson made clear at the arbitral hearing through his statement to Arbitrator Henderson, had the Commissioner spoken to him, it would have been clear that Mr. Peterson had grave remorse for hurting his son, and that the situation would never happen again. *See, e.g.*, Ex. 122 (*Peterson* Hr'g Tr. 133:17-23) (Peterson) ("[I]t was definitely a learning experience for me, you know, when it comes to discipline, disciplining, you know, my kids and, you know, moving forward, of course, that is something I would never want to happen to any of my kids, ever. Nothing, that's something that I wouldn't ever repeat or want that to happen again."); *id.* 135:25-136:2 ("[I]t's a situation that will never happen again and I really regret that it happened.").

**E.  The Commissioner Appoints Former NFL Executive and Current Advisor Harold Henderson As Arbitrator of Mr. Peterson's Article 46 Appeal**

106.  On November 20, the NFLPA sent a Notice of Appeal to Commissioner Goodell and requested that the Commissioner recuse himself from arbitrating Mr. Peterson's appeal and appoint an impartial arbitrator from outside the NFL in his stead. *See* Ex. 20 (*Peterson* Notice of Appeal at 5).  The following day, Commissioner Goodell designated Mr. Henderson to serve as the Article 46 Hearing Officer for Mr. Peterson's arbitration, which the NFL scheduled for hearing on December 2.  Ex. 21.  As detailed above and below, Mr. Henderson is clearly evidently partial under the controlling objective standard, and he should have recused himself from this proceeding.

107.  The NFLPA sent a letter to Mr. Henderson objecting to his service as the arbitrator of Mr. Peterson's appeal and seeking his recusal ("Recusal Letter").  Ex. 22.  The Recusal Letter explained that, in light of the specific circumstances surrounding Mr. Peterson's appeal, which would turn upon a review of Commissioner Goodell's and Mr. Vincent's conduct, Mr. Henderson's close ties to Commissioner Goodell and the NFL rendered him evidently partial and disqualified him from serving as arbitrator.

108.  The NFL opposed the NFLPA's Recusal Letter and Mr. Henderson rejected the request. *See* Ex. 23; Ex. 121.

**F.  Mr. Peterson's Appeal Hearing**

109.  On December 2, 2014, Mr. Henderson heard Mr. Peterson's Article 46 disciplinary appeal.  The NFLPA reiterated its objection to Mr. Henderson serving as arbitrator, Ex. 122 (*Peterson* Hr'g Tr. 18:3-19:3) (Kessler), and argued against the

Commissioner's discipline on the principal grounds that (i) Mr. Peterson was punished retroactively under the New Policy, (ii) Mr. Peterson's suspension should have been within the two-game maximum, consistent with domestic violence disciplinary precedent under the applicable Previous Policy, and (iii) the Commissioner's discipline exceeded his CBA authority by purporting to subject Mr. Peterson to punishments and procedures that were not collectively bargained (*e.g.*, disciplining and preventing Mr. Peterson from playing via a Commissioner's Exempt List suspension and imposing disciplinary requirements in which the NFL would determine how and from whom Mr. Peterson should seek counseling).

110.   Because of its importance to Mr. Peterson's disciplinary appeal, the NFLPA and Mr. Peterson introduced as evidence the entire record from the *Rice* Article 46 appeal hearing before Judge Jones. *See* Ex. 122 (*Peterson* Hr'g Tr. 130:4-131:1).

## G.   The Arbitration Award Is Issued

111.   On December 12, Mr. Henderson issued the Arbitration Award, rejecting every single one of the NFLPA and Mr. Peterson's arguments and upholding every aspect of the Commissioner's discipline of Mr. Peterson. Ex. 126 (*Peterson* Arb. Award at 8). Thereafter, this Petition was promptly filed because Mr. Peterson remains barred from the Vikings and from the NFL, and is irreparably harmed each day the Award remains in effect.

## LEGAL ARGUMENT

**I.   THE AWARD MUST BE SET ASIDE BECAUSE IT AFFIRMS RETROACTIVE APPLICATION OF THE NEW POLICY, VIOLATING THE ESSENCE OF THE CBA AND FUNDAMENTAL FAIRNESS**

**A.   Retroactive Application of the New Policy Disregards the "Law of the Shop" and Therefore Violates the Essence of the CBA**

112.   The Arbitration Award's affirmance of the retroactive application of the New Policy to Mr. Peterson's conduct disregards the "law of the shop" in the NFL and thus violates the essence of the CBA, a clear ground for vacatur.

113.   An arbitration award must "draw[] its essence from the collective bargaining agreement." *Enterprise Wheel*, 363 U.S. at 597; *see also Misco*, 484 U.S. at 38.  If an award fails to do so, it must be vacated.  *Enterprise Wheel*, 363 U.S. at 597; 9 U.S.C. § 10(a)(1)-(4); *PSC Custom*, 763 F.3d at 1009.

114.   In evaluating an arbitration award on "essence of the agreement" grounds, "an arbitrator's source of law is not confined to the express provisions of the contract, as the industrial common law—the practices of the industry and the shop—is equally a part of the collective bargaining agreement although not expressed in it." *Trailways Lines*, 807 F.2d at 1423 n.12 (internal quotation marks omitted) (citing *Warrior & Gulf Navigation Co.*, 363 U.S. at 581–82).  In fact, "law of the shop" decisions "usually become . . . binding part[s] of the [collective bargaining] agreement and will be followed by arbitrators thereafter."  Elkouri & Elkouri, *How Arbitration Works* 11-14 (Kenneth May et al. eds., 7th ed. 2012).

115.   Where a "prior decision involves the interpretation of the identical contract provision, between the same company and union, every principle of common sense, policy, and labor relations demands that it should stand until the parties annul it by a newly worded contract provision." *Trailways Lines*, 807 F.2d at 1425 (internal quotation marks and citation omitted).

116.   Here, ***just four days before*** Mr. Peterson's arbitration appeal, Arbitrator Jones—a retired United States District Court Judge—ruled on the exact same issue presented to Mr. Henderson, *i.e.*, the propriety of applying the New Policy retroactively to discipline players under Article 46 of the CBA.  As set forth above, Judge Jones held— repeatedly—in her *Rice* decision that Commissioner Goodell lacked the authority to apply the New Policy to conduct which occurred before it was put into effect as it would be arbitrary or capricious to do so. *See, e.g.*, Ex. 119 (*Rice* Appeal Decision, slip op. at 7)(the NFL is *"required to provide proper notification"* of changes in player discipline) (emphasis added); *id.* (the New Policy is "forward[-]looking" and "even under the broad deference afforded to him through Article 46, [the Commissioner] could not retroactively apply" it); *id.* at 17 ("I find that the imposition of the indefinite suspension was arbitrary.").

117.   Judge Jones' holding was consistent with those of prior NFL CBA arbitrations, which Mr. Henderson stated were "distinguishable" without providing any indication of the basis for such distinction. Ex. 126 (*Peterson* Arb. Award at 6); *see also, e.g.*, Ex. 82 at 0584 (*Reggie Langhorne*, Opinion & Award (1994)) (Kasher, Arb.) (setting aside fine and suspension because Player "was entitled at some time to be placed on notice as to what consequences would flow from his refusal to [abide by the rules].  Any

disciplinary program requires that individuals subject to that program understand, with reasonable certainty, what results will occur if they breach established rules."); Ex. 101 at 0675 (*Ricky Brown*, Opinion & Award (2010) (Beck, Arb.) (vacating team discipline because player did not receive adequate notice of rule he was accused of violating); Ex. 87 at 0629 (*Laveranues Coles*, Opinion & Award (2009)) (Townley, Arb.) (same).

118.    Incredibly, despite both parties citing extensively to Judge Jones' *Rice* decision during the arbitration, the Award makes no mention whatsoever of the applicable holdings in that decision which establish the New Policy cannot be retroactively applied, and that discipline must be "fair and consistent" with the NFL's applicable Previous Policy of a two-game maximum suspension for first-time offenders. *See* Ex. 119 (*Rice* Appeal Decision, slip op. at 5 & n.4, 8, 16). Indeed, Mr. Henderson cites the *Rice* decision for other points, but simply ignores it with respect to the controlling question of whether the Commissioner had the authority to apply the New Policy retroactively. Mr. Henderson was not authorized to disregard the controlling authority on this dispositive issue. *See, e.g.,* *Trailways Lines*, 807 F.2d at 1425 (expressing "grave concerns" over arbitrator's treatment of prior relevant arbitration award and vacating on essence of agreement grounds).

119.    Arbitrator Henderson's disregard for this settled "law of the shop" was inconsistent with the essence of the CBA and thus must be vacated. Indeed, courts have time and again vacated arbitration awards "solely because of the arbitrator's failure to consider . . . an extremely relevant source of common law—the law of the shop." *Trailways Lines*, 807 F.2d at 1423; *see also Norfolk Shipbuilding & Drydock Corp. v. Local No 684 of Int'l Bhd. of Boilermakers*, 671 F.2d 797, 799-800 (4th Cir. 1982) (vacating arbitration

47

award and remanding to district court with instructions to consider evidence of "any existing common law of the . . . industry" or "any custom and practice relating to the . . . dispute," which "the arbitrator must take into account"); *cf.* Elkouri, *supra*, 12-2 ("custom and past practice may be held enforceable through arbitration as being, in essence, a part of the parties' 'whole' agreement").

**B.     By Assessing Mr. Peterson's Punishment under the Previous Policy, Arbitrator Henderson Exceeded His Authority, Further Violating the Essence of The CBA**

120.    "[A]n arbitrator cannot exceed the authority given to him by the collective bargaining agreement or decide matters parties have not submitted to him." *Doerfer Eng'g, a Div. of Container Corp. of Am. v. N.L.R.B.*, 79 F.3d 101, 103 (8th Cir. 1996); *see also United Steelworkers of Am. v. Enter. Wheel & Car Corp.*, 363 U.S. 593, 597-98 (1960) (an "opinion of [an] arbitrator . . . based solely upon the arbitrator's view of [textual authority], . . . would mean that he exceeded the scope of the submission"). Where an arbitrator exceeds his powers by addressing a question not submitted to him, the award must be vacated. *N. States Power Co., Minnesota v. Int'l Bhd. of Elec. Workers, Local 160*, 711 F.3d 900, 903 (8th Cir. 2013) (affirming vacatur of award where "arbitrator had no authority to address the second question" submitted by the parties because parties had directed that he only answer second question if he concluded otherwise with respect to the first).

121.    Mr. Henderson exceeded his authority under the CBA by deciding an issue not submitted to him by the parties and not in dispute in the arbitration—whether Mr.

Peterson's punishment could stand muster in the hypothetical scenario in which it was imposed under the Previous Policy. Ex. 126 (*Peterson* Arb. Award at 5).

122.   The discipline that Commissioner Goodell actually imposed, and thus the only discipline that Mr. Peterson appealed, was indisputably based on the New Policy. *See, e.g.,* Ex. 18 (Discipline Ltr. at 2-3); *see also* Ex. 122 (*Peterson* Hr'g Tr. 85:20-86:3) (NFL counsel) ("[NFLPA counsel] is correct that in the letter of November 18th, the Commissioner cites the new policy that he announced on August 28th that would be applied on a going-forward basis to cases involving domestic violence as well as cases like this."); *id.* 88:6-13 (arguing that the Commissioner may "apply[] new disciplinary measures on a going-forward basis where the arrest and the disposition come to the League's attention after that time").

123.   Because Mr. Henderson was determined to deny Mr. Peterson's appeal and had no way around Judge Jones' holding or Commissioner Goodell's testimony that the New Policy could not be retroactively applied, he invented a hypothetical issue not before him as to whether Mr. Peterson could have been indefinitely suspended under the Previous Policy.  This determination was in excess of Mr. Henderson's arbitral authority under the CBA and in and of itself compels vacatur.

## C.   Retroactive Application of the New Policy also Violated Principles of Fundamental Fairness

124.   Additionally, a court must vacate an arbitration award where an arbitrator's determination "is not simply an error of law, but [is one] which so affects the rights of a party that it may be said that he was deprived of a fair hearing." *Grahams Serv. Inc. v.*

*Teamsters Local 975*, 700 F.2d 420, 422 (8th Cir. 1982); *see also Hoteles Condado Beach v. Union De Tronquistas Local 901*, 763 F.2d 34, 40, 42 (1st Cir. 1985) (affirming vacatur where decisions of arbitrator so "prejudice[d] the rights of the parties to the arbitration proceedings . . . as to warrant judicial review and to mandate vacatur of the arbitration award"); *Int'l Union, United Mine Workers of Am. v. Marrowbone Dev. Co.*, 232 F.3d 383, 388 (4th Cir. 2000) (vacating arbitration award where arbitrator denied the Union its fundamental right to a fair hearing); *accord Bellantuono v. ICAP Sec. USA, LLC*, 557 F. App'x 168, 176 (3d Cir. 2014); *Laws v. Morgan Stanley Dean Witter*, 452 F.3d 398, 399 (5th Cir. 2006).[7]

• In employee discipline cases, an arbitration award must comport with well-established principles of fundamental fairness and industrial due process. *See Stroehmann Bakeries, Inc. v. Local 776, Int'l Bhd. of Teamsters*, 969 F.2d 1436, 1444 (3d Cir. 1992) ("Though the concept of industrial due process is not easy to define exhaustively, its use is standard practice in interpreting general provisions in [CBAs] that require fair discipline procedures."); *see also Tempo Shain*, 120 F.3d at 20-21 (vacating arbitration award due to "fundamental unfairness" of arbitration panel determinations); *In re American Airlines, Inc.*, 116 Lab. Arb. Rep. (BNA) 161, 165 (Sept. 7, 2001) (Sergent, Arb.) ("[W]hile arbitrators will generally defer to a [disciplinary] decision of Management . . . they should

---

[7] The Petition has been brought under the FAA and the LMRA, and in LMRA cases federal courts look to the FAA for guidance when adjudicating "labor arbitration cases." *Associated Elec. Co-op., Inc. v. Int'l Bhd. of Elec. Workers, Local No. 53*, 751 F.3d 898, 905 (8th Cir. 2014) (quoting *Misco, Inc.*, 484 U.S. at 40 n.9).

not hesitate to step in and rescind or modify the penalty if it is found to be violative of fundamental notions of fairness and/or industrial due process.").

125.   When an arbitration award upholds employer discipline that was imposed in violation of fundamental fairness or the tenets of industrial due process, neither arbitral nor judicial authority can permit such discipline or award to stand. *See, e.g., Stroehmann Bakeries*, 969 F.2d at 1445 (acknowledging "the unobjectionable general proposition that arbitrators' awards that reinstate discharged employees are not subject to judicial interference if the employer did not afford the employee industrial due process."); *Amalgamated Transit Union Div. 757*, 1999 Lab. Arb. Supp. 104613, at 12-13 (Aug. 14, 1999) (Gallagher, Arb.) ("The fact that an employee is entitled to certain rights of due process before any disciplinary action can be taken against him is a matter long settled in arbitration. . . . [W]here [management] fails to [meet due process requirements,] most arbitrators refuse to sustain the discharge or discipline assessed against the employee.").

126.   Advance notice of prohibited employee conduct and potential disciplinary consequences of prohibited conduct is an indispensable element of a fair labor arbitration process, such that an employer's discipline must be set aside when notice of prohibited conduct or potential consequences is not timely provided to an employee. *See, e.g., Chauffeurs, Teamsters & Helpers Local Union No. 878 v. Coca-Cola Bottling Co.*, 613 F.2d 716, 720 (8th Cir. 1980) ("Arbitrators generally . . . require that employees be given advance notice of company rules."); *see Super Tire Eng'g Co. v. Teamsters Local Union No. 676*, 721 F.2d 121, 125 (3d Cir. 1983) (upholding arbitration award reinstating employee fired in violation of right to notice that discharge could be a consequence of his

actions); *Safeway Stores, Inc. v. United Food Workers Union, Local 400*, 621 F. Supp. 1233, 1241-43 (D.D.C. 1985) (upholding arbitration award reinstating employee where employer violated the worker's rights by failing to provide timely notice of potential for discipline); *In re Metrohealth Med. Ctr.*, 108 Lab. Arb. Rep. (BNA) 974, 981 (June 9, 1997) (Franckiewicz, Arb.) ("Employees are entitled to be given adequate notice, not only of what conduct is prohibited, but also of the likely effect on their future employment if they violate a prohibition.").[8]

127.   The NFL cannot be heard to argue that the requirement of notice does not apply to the discipline of NFL players because of the broad conduct detrimental authority granted to the Commissioner under Article 46.   Indeed, Commissioner Goodell—who imposed Mr. Peterson's discipline—recently admitted under oath that such notice requirements must be complied with before the New Policy could be applied to NFL players. *See* SOF II.D, *supra*.   Similarly, NFL Executive Vice President Troy Vincent, in consultation with the Commissioner and other NFL officials over Mr. Peterson's discipline, told Mr. Peterson that he could not be subject to the New Policy for conduct which took place before that New Policy was announced. *See* SOF III.B, *supra*.

128.   Indeed, Mr. Vincent could not have been any clearer on this issue in his November 12 conversation with Mr. Peterson. *See* Ex. 28 (Nov. 12 Audio Recording 4:23-5:12) (emphasis added) ("[S]o remember this, A.P. . . . today, ***you're not subject to the***

---

[8] *See additionally* Elkouri, *supra*, at 15-71 ("An employee must receive clear notice of both what the employer expects as well as the range of penalties that may be imposed . . . ."); *cf. Tempo Shain*, 120 F.3d at 20-21.

*new personal conduct policy. . . . [B]ecause of when this occurred, . . .* they're looking

at how they would treat this in the old, like the current policy—not the new, the current.").

And, Mr. Vincent confirmed at the arbitration his understanding that the New Policy did

not apply to Mr. Peterson's conduct. *See* Ex. 122 (*Peterson* Hr'g Tr. 194:12-16) (Vincent)

("Q. . . . My question is you were telling him he was not subject to the new Personal

Conduct Policy; is that right? A. Yes."); *id.* (*Peterson* Hr'g Tr. 195:19-196:4) (Vincent)

("Q. Your understanding as the Executive Vice President of the National Football League,

in your position, was that the new Personal Conduct Policy would only apply going

forward, correct, not the past behavior? That was your understanding at this time? A.

Correct. Q. And that is what you were conveying to Adrian? A. Yes.").

129. Despite finding Mr. Vincent to be "cand[id]" and "honest[]," Ex. 126

(*Peterson* Arb. Award at 7) on issues that suited his desired outcome, Mr. Henderson

ignored the foregoing testimony in issuing the Award.

130. Mr. Henderson similarly ignored Commissioner Goodell's testimony in the

*Rice* arbitration about the notice requirement. As the Commissioner testified in that

arbitration, ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████ Ex. 3 Aug. 28, 2014 Goodell Ltr. to Owners at 0009)

(announcing that increased standards of New Policy were "[e]ffective immediately"). In

fact, after announcing the New Policy, Commissioner Goodell instructed all NFL teams

to take three "prompt[]" steps, two of which were to distribute the attached one-page memorandum outlining the New Policy to "every player under contract to your club," and to ensure that each team's head coach personally reviewed the New Policy with all of their players. *Id.* at 0010. Mr. Henderson ignored all of this evidence, too.

131.    At bottom, at the time of the conduct at issue (May 2014), Mr. Peterson did not have any notice that, several months later, Commissioner Goodell would announce the New Policy in response to unimaginable criticism for the League's handling of the situation involving Mr. Rice. As discussed below (*infra* I.D), the NFL's historical application of the Previous Policy had established a maximum suspension of two games for a player found to be guilty of an act of domestic violence for the first time. By contrast, the New Policy marked a dramatic change—including a six-game suspension as the new presumptive penalty for first-time domestic violence offenders. For the NFL retroactively to apply this New Policy to Mr. Peterson's conduct, without any advance notice at all, is simply irreconcilable with principles of fundamental fairness and consistency.

**D.    Mr. Peterson Should Have Been Suspended, at Most, for Two Games**

132.    Mr. Peterson would have been subjected to a maximum suspension of two games without pay if the Arbitration Award had applied the Previous Policy and were not in defiance of fundamental fairness and the essence of the CBA.

133.    As set forth above, the Arbitration Award completely disregards that Judge Jones held, Commissioner Goodell testified, and the *Peterson* arbitration record otherwise established that two games is the maximum permissible suspension for first-time offenders under the Previous Policy. Indeed, this is why Mr. Vincent—having consulted with

Commissioner Goodell and others at the NFL—told Mr. Peterson he would not be subjected to the New Policy and would only be suspended for two games. *See* Ex. 28 (Nov. 12 Audio Recording 4:23-5:12) (Vincent); Ex. 122 (*Peterson* Hr'g Tr. 194:12-16) (Vincent); *id.* 195:19-196:4 (Vincent); Statement of Facts III.A, *supra.*

134.    On November 12—just six days before Mr. Peterson was issued his unlawful discipline by Commissioner Goodell—Mr. Vincent told Mr. Peterson that he would be subject to a two-game suspension:

> ADRIAN PETERSON: Hmm.  So two games?
> TROY VINCENT:  That is if you—but you cannot—you've, you've gotta act—you gotta just go through the process."[9]
> . . .
> ADRIAN PETERSON: Mm hmm. That I get the two games? Um . . . .
> TROY VINCENT: Yeah.
> ADRIAN PETERSON: So basically two game checks.
> TROY VINCENT: Um, I'm not sure what the actual--but I think they were talking about potentially having you come back and that two games, now this is the two games, one would be--that includes this weekend.
> ADRIAN PETERSON: Oh, so it, it'll be two additional games, not get time served.
> TROY VINCENT: No, no, no, no, no, no, no. No. It will--The one this weekend.
> ADRIAN PETERSON: Mm.
> TROY VINCENT: *So really it's just next week and you, you, you, you, you, you're rolling, you're back.*[10]

135.    Mr. Vincent tried to retreat during his arbitration testimony, claiming that he had merely informed Mr. Peterson that "[a]ll things will be considered." Ex. 126 (*Peterson*

---

[9] Ex. 27 (Nov. 12 Audio Recording 4:16-19).
[10] *Id.* (Nov. 12 Audio Recording 5:10-6:2) (emphasis added); *see also id.* 6:15-24; Ex. 28 (Nov. 12 Audio Recording 17:22-18:2).

Arb. Award at 7).    Incredibly, Mr. Henderson chose to rely on that after-the-fact "explanation" which was inconsistent with everything Mr. Vincent told Mr. Peterson in plain words on the two recorded phone calls.  SOF III.B, *supra*.  In any event, this is not a factual issue for the Court decide.  Rather, the Court need only rely on Judge Jones' legal conclusion in *Rice* about the effective two-game maximum punishment under the Previous Policy or its own legal review of the undisputed disciplinary record, set forth in footnote 4 of Judge Jones' decision in *Rice*, which leaves no doubt that there had never been a first-time offender suspended for more than two games.

136.    The Arbitration Award defies the "law of the shop" in this respect too.  It upholds Mr. Peterson's discipline as "fair and consistent" under the Previous Policy, explaining that "while the discipline assessed is indeed greater than in most prior cases" (actually *all* prior cases, for first-time domestic violence offenses), according to Mr. Henderson, "this is arguably one of the most egregious cases of domestic violence in this Commissioner's tenure."  Ex. 126 (*Peterson* Arb. Award at 5).  This pure hyperbole by Mr. Henderson is entitled to no weight when reviewed against precedents in the NFL.

137.    First of all, while all acts of domestic violence are horrible, Mr. Henderson's assertion that Mr. Peterson's single act of excessive corporal punishment of his child is far more egregious than any conduct subjected to the two-game maximum under the Previous Policy cannot withstand judicial review.  These prior NFL cases included:

- Player was charged with domestic assault, later dismissed, after he "banged [fiancée's] head against a towel rack"; threw her down a flight of stairs; threw her over a chair and onto the couch, causing cuts to her hands and wrist; and forcibly tried to remove her ring, breaking nine fingernails.  The player was suspended for two (2) games (the

NFLPA understands from public reports that the suspension was later vacated in its entirety). Ex. 84; Ex. 84A; Ex. 85.

- Player was found guilty of two "domestic violence-related" felony counts of Battery and False Imprisonment, was sentenced to two years' probation by the court, and received a suspension of two (2) games from the NFL. Ex. 113.

- Player was charged with two counts of battery and two counts of vandalism for assaulting former girlfriend, pled no contest to vandalism and a lesser charge of false imprisonment without force or violence, and was suspended for one (1) game by the NFL, later reduced to a one-game fine. Ex. 86.

- Player was arrested for domestic battery for pushing longtime girlfriend during argument, resulting in red marks on girlfriend's neck that were still visible when police arrived 45 minutes later, was accepted into Deferred Prosecution Agreement/Intervention Program, and was suspended for one (1) game. Ex. 88; Ex. 91.

- Player was charged with two misdemeanor disorderly conduct counts after he, among other things, threw ice at his girlfriend and "forcibly knocked" her to the floor in a public setting. Player entered a Deferred Acceptance of Guilty Plea Agreement, which dropped one disorderly conduct charge and reduced the other to a forfeiture count. Player's suspension of one (1) game was reduced to a one-game fine on appeal. Ex. 90; Ex. 92.

- Player was arrested on a domestic assault charge for pushing his former girlfriend—at the time five months pregnant with the Player's child—down onto a love seat and choking her for six seconds, and was later accepted into a deferred prosecution program. Player was suspended for two (2) games. Ex. 98; Ex. 99.

- Player was charged with simple battery – domestic for causing small lacerations on his live-in girlfriend's fingers and pushing her with an open hand, causing her to fall and strike her head on the pavement. Player was suspended for one (1) game. Ex. 103.

- Player was charged with Substantial Battery and pled guilty to a lesser charge of Disorderly Conduct – Domestic Violence for an altercation in which he shoved the mother of his two children and caused her to fall and lacerate her head on a bed post, requiring four stitches and a splint on her thumb. Player was suspended for one (1) game. Ex. 107; Ex. 108.

- Player was charged with misdemeanor Simple Battery – Dating Violence, and pled no contest to a lesser disorderly conduct charge, for attempting to pull his girlfriend out of a car by her arms and "slap[ping] her across the face with an open hand." Player was fined half a week's pay. Ex. 111; Ex. 112; Ex. 112A.

Because the NFL never applied more than a two-game suspension to all of these prior acts, fair and consistent treatment required no greater punishment for Mr. Peterson.

138.   Second, even if one were to accept Mr. Henderson's assertion that excessive parental discipline against a child is far worse than domestic violence acts against an adult, the NFLPA presented past child abuse cases to Mr. Henderson from under the Previous Policy, but he disregarded those too.   Ex. 80 (three-game suspension for child endangerment *and* marijuana possession charge, *i.e.*, two different offenses resulting in a combined punishment a fraction of Mr. Peterson's); Ex. 81 (no suspension for child abuse, but labeled repeat Policy offender).

139.   The reality is that under the Previous Policy, the NFL never punished any first-time offender for any type of domestic violence with a suspension greater than two games.   There was no basis in the CBA or the "law of the shop" for Mr. Henderson to simply make up new rules for a hypothetical case of Mr. Peterson being punished under the Previous Policy.

140.   Finally, the NFLPA and Mr. Peterson note that even an additional two-game suspension would result in overall discipline for Mr. Peterson far harsher than any previous punishment for a first-time domestic violence offender.   The reason is that Mr. Peterson has already been banished to the Commissioner's Exempt List against his will since early

November.  Adding two more games to this would result in total discipline in excess of any other for a first-time offender for domestic violence under the Previous Policy.  The short "shelf life" of NFL players, which Mr. Vincent acknowledged, is one of the principal reasons why missing games is widely recognized by the Courts to inflict irreparable harm on professional athletes. [11]   The Previous Policy may have been a "mistake," as Commissioner Goodell concluded, but it was still the Policy that had to be applied to Mr. Peterson's May 2014 behavior, which took place long before the significantly increased penalties of the New Policy went into effect on August 28, 2014.

---

[11] *Cf., e.g., Brady v. Nat'l Football League*, 779 F. Supp. 2d 992, 1005 (D. Minn. 2011) ("the threat of harm shown by [football player] Plaintiffs here, including lost playing time, constitutes irreparable harm"), *rev'd on other grounds*, 644 F.3d 661 (8th Cir. 2011); *NFLPA v. NFL (StarCaps)*, 598 F. Supp. 2d 971, 982 (D. Minn. 2008) (for players like Mr. Peterson, who are "central to their team's chances of making the playoffs[, t]he failure to make the playoffs and the effect of that failure on the players, teams, and fans is not compensable monetarily and is therefore an irreparable harm"); *Jackson v. Nat'l Football League*, 802 F. Supp. 226, 231 (D. Minn. 1992) ("[t]he existence of irreparable injury is underscored b y t he u ndisputed bre vity and  precariousnes s of  the  pla yers' careers in professional sports, particularly in the NFL"); *Bowman v. Nat'l Football League*, 402 F. Supp. 754, 756 (D. Minn. 1975) (recognizing players suffered irreparable harm when the NFL's boycott of former World Football League players prevented them from playing); *cf. also Silverman v. Major League Baseball Player Relations Comm., Inc.*, 67 F.3d 1054, 1062 (2d Cir. 1995) ("Given the short careers of professional athletes and the deterioration of physical abilities through aging, the irreparable harm requirement has been met."); *Neeld v. Am. Hockey League*, 439 F. Supp. 459, 461 (W.D.N.Y. 1977) (finding irreparable harm because a "young athlete's skills diminish and sometimes are irretrievably lost unless he is given an opportunity to practice and refine such skills at a certain level of proficiency"); *Linseman v. World Hockey Ass'n*, 439 F. Supp. 1315, 1319 (D. Conn. 1977) ("The career of a professional athlete is more limited than that of persons engaged in almost any other occupation.").

## II.  THE ARBITRATION AWARD SHOULD ALSO BE SET ASIDE FOR THE ARBITRATOR'S EVIDENT PARTIALITY

141.  An arbitration award issued by an evidently partial arbitrator must be set aside. 9 U.S.C. § 10(a)(2); *Commonwealth Coatings*, 393 U.S. at 147 (Section 10 of the FAA "show[s] a desire of Congress to provide not merely for any arbitration but for an impartial one."); *id.* at 150 (vacating arbitration award because it is a "rule of arbitration . . . that any tribunal permitted by law to try cases and controversies not only must be unbiased but also must avoid even the appearance of bias"); *Olson*, 51 F.3d at 159.

142.  In the Eighth Circuit, evident partiality will be found where an arbitrator is tainted by information that "'objectively demonstrate[s] such a degree of partiality that a reasonable person could assume that the arbitrator had improper motives.'" *Williams*, 582 F.3d at 885 (citing *Dow Corning Corp. v. Safety Nat'l Cas. Corp.*, 335 F.3d 742, 750 (8th Cir. 2003)).  Even the appearance of bias is enough to constitute evident partiality.  *See Commonwealth Coatings*, 393 U.S. at 150 ("[A]ny tribunal permitted by law to try cases and controversies not only must be unbiased but also must avoid even the appearance of bias."); *cf. Olson*, 51 F.3d at 159 (quoting *Commonwealth Coatings*, 393 U.S. at 149) (finding arbitrator evidently partial because he had a substantial interest in a company doing business with party to arbitration and thus his "relationship create[d] an impression of possible bias" requiring vacatur); *Winfrey v. Simmons Foods, Inc.*, 495 F.3d 549, 552 (8th Cir. 2007) (party-appointed arbitrator's failure to disclose the extent of his relationship with one of the parties did not create an impermissible appearance of bias requiring vacatur); *Montez v. Prudential Secs., Inc.*, 260 F.3d 980, 982 (8th Cir. 2001) (affirming

district court decision that arbitrator's past relationship to one of the parties did not satisfy the "appearance of bias" standard articulated by Justice Black in *Commonwealth Coatings*); *contra Williams*, 582 F.3d at 885 ("Th[e] [evident partiality] standard is not made out by the mere appearance of bias.") (citing 3 Fed. Proc. § 4:119 (Lawyers ed. 2009), but no judicial precedent).

143.   There is no question Mr. Henderson is evidently partial—even the NFL will not contest this.  Instead, the NFL will argue that the legal requirements concerning partiality do not apply here because Article 46 contemplates a biased arbitrator by virtue of the NFLPA's agreement that either the NFL Commissioner or his designee serve in this role.  The NFL's argument is legally incorrect. *Nat'l Hockey League Players' Ass'n v. Bettman*, No. 93 Civ. 5769, 1994 WL 738835, at *13 (S.D.N.Y. Nov. 9, 1994) (in addressing NHL Commissioner arbitration, holding that "even the agreed-upon appointment of an arbitrator with known links to one side of the controversy does not immunize the status or conduct of [a] decisionmaker from all judicial scrutiny").

144.   The union's agreement to Commissioner arbitrations under Article 46  does not negate the evident partiality rule in a unique case like this, where the subject of the arbitration is not Mr. Peterson's conduct (which the NFLPA and the player conceded to constitute conduct detrimental), but the conduct of Commissioner Goodell and NF L Executive Vice President Vincent in conducting a fundamentally unfair discipline process motivated by the Commissioner's desire to fend off intense public criticism over his handling of domestic violence incidents.  Even an agreement to have the League's Commissioner serve as arbitrator does not prevent an evident partiality disqualification

where the conduct of the arbitrator himself is at issue. *See, e.g., Erving v. Virginia Squires Basketball Club*, 468 F.2d 1064, 1067, 1068 n.2 (2d Cir. 1972) (affirming district court order disqualifying Commissioner and replacing him with a neutral arbitrator due to Commissioner's employment with law firm of party to arbitration); *Morris*, 575 N.Y.S.2d at 1017 (disqualifying NFL Commissioner as arbitrator because plaintiffs demonstrated "evidence of lack of neutrality and 'evident partiality' and bias on the part of the Commissioner with respect to this specific matter," due to his past advocacy of a position that conflicted with plaintiff's position in arbitration); *see also In re Wal-Mart Wage & Hour Emp't Practices Litig.*, 737 F.3d 1262, 1267-68 (9th Cir. 2013) (holding that parties to arbitration may not waive or contract out of the minimum standards of [industrial] due process that are preserved in enumerated grounds for vacatur in FAA). Indeed, it was for similar reasons that even Commissioner Goodell agreed to appoint a true neutral arbitrator in *Rice*.

145.   Although the use of an evidently partial arbitrator may be agreed to by parties in a general category of cases, "in practice, that risk of bias could nonetheless materialize in specific instances," warranting disqualification or, otherwise, vacatur. *JCI Commc'ns, Inc. v. Int'l Bhd. of Elec. Workers, Local 103*, 324 F.3d 42, 52 (1st Cir. 2003).

146.   Invoking the above principles and pointing out that the conduct of the NFL Commissioner and Mr. Vincent would be the central issues in Mr. Peterson's arbitration, the NFLPA lodged several objections to the impropriety of Mr. Henderson serving as the arbitrator here because of his close professional and financial ties to the NFL. *See, e.g.,* Ex. 20 (*Peterson* Notice of Appeal); Ex. 22 (Recusal Letter); Ex. 122 (*Peterson* Hr'g Tr.

18:3-19:3).   In the similar situation in *Rice*, the NFL accepted that an outside, neutral arbitrator had to be utilized and appointed Judge Jones.   However, after losing *Rice*, the NFL refused to follow the same proper course in *Peterson*.   This failure provides an independent ground for vacatur.   Indeed, as cited above, courts have previously disqualified sports league Commissioners who have been agreed to as arbitrators—including the NFL Commissioner—in circumstances where their involvement in the dispute rendered them partial in a way the parties could not have foreseen at the time of agreement.   *See Erving*, 468 F.2d at 1067-1068; *Morris*, 575 N.Y.S.2d at 1017.

147.   Here, there should be no dispute that Commissioner Goodell, the designated arbitrator in the CBA, was disqualified from serving as the arbitrator because he had a "personal stake in the outcome of the arbitration." Elkouri, *supra*, 2-33 (citing *Pitta v. Hotel Ass'n of New York City, Inc.*, 806 F.2d 419, 423 (2d Cir. 1986) (stating "[i]t is axiomatic that a neutral decision-maker may not decide disputes in which he or she has a personal stake")); *see also, e.g., Olson*, 51 F.3d at 159 (vacating arbitration award because arbitrator did not disclose that he "had a substantial interest in [a company that did business with one of the parties] as a high ranking officer, and [the company] did more than trivial business with [the party]"). This follows from the fact that a central issue in the arbitration was the improper conduct of Commissioner Goodell to retroactively apply the New Policy to Mr. Peterson in order to reach a disciplinary result that was more severe than the two-game punishment of Mr. Rice that led to so much criticism and calls for the Commissioner's resignation. That Commissioner Goodell testified under oath in *Rice* that he could not retroactively apply the New Policy put the Commissioner's own sworn

testimony at issue.  The conduct of Mr. Vincent—and the facts about the Commissioner retaliating against Mr. Peterson after Mr. Vincent could not convince him to participate in the hearing with NFL advisors—compounded the fact that the behavior of NFL executives had to be adjudicated and that the Commissioner could not possibly arbitrate his own behavior and that of other NFL executives.

148.   Once it is recognized that Commissioner Goodell could not serve as the arbitrator, it follows, *a fortiori*, that Mr. Henderson—the former head of Defendant NFLMC, with continuing substantial financial ties to the NFL and Commissioner Goodell—similarly could not serve without violating the evident partiality doctrine. Indeed, the evident partiality test is an objective standard which turns on whether a reasonably informed person would view Mr. Henderson as biased, not whether he is actually biased. *See Dow Corning Corp. v. Safety Nat'l Cas. Corp.*, 335 F.3d 742, 750 (8th Cir. 2003) (evident partiality exists where the circumstances "objectively demonstrate such a degree of partiality that a reasonable person could assume that the arbitrator had improper motives"); *Applied Indus. Materials Corp. v. Ovalar Makine Ticaret Ve Sanayi, A.S.*, 492 F.3d 132, 137 (2d Cir. 2007) ("[A]n arbitrator is disqualified only when a reasonable person, considering all of the circumstances, would have to conclude that an arbitrator was partial to one side.").  Here, any reasonable observer would view Mr. Henderson as being evidently partial such that his approval of Commissioner Goodell's discipline was entirely expected.  *See, e.g., Arbitrator Upholds Adrian Peterson Suspension*, OUTSIDE THE BELTWAY (Dec. 13, 2014) ("Peterson's outcome was less surprising because his appeal

was heard by Henderson, a former N.F.L. vice president and current special adviser to the league who was chosen by Goodell.")

149.   In the proceedings below, the NFL argued that Mr. Henderson served as an arbitrator in many prior Article 46 appeals without objection from the NFLPA.  But none of those prior appeals required Mr. Henderson to assess the conduct of Commissioner Goodell and other NFL Executives, much less in an environment where Commissioner Goodell's job was on the line.  The extraordinary factual circumstances surrounding Mr. Peterson's appeal here required Mr. Henderson to recuse himself.  His refusal to do so tainted the entire arbitration proceeding and provides another reasons why this Court should vacate the arbitration.

150.   Finally, the NFLPA must note that the Award itself smacks of bias and a results-oriented approach.   For example, Mr. Henderson parroted the Commissioner Discipline Letter in writing that Mr. Peterson's "public comments do not reflect remorse," Ex. 126 (*Peterson Arb. Award at 8*), while simply ignoring the factual record—including submissions by the NFL itself—in which Mr. Peterson in no uncertain terms expressed his regret:

- Ex. 29 (Statement from Adrian Peterson, September 15, 2014) ("I want everyone to understand how sorry I feel about the hurt I have brought to my child.");

- *Id.* (". . . I have said the same thing, and that is that I never ever intended to harm my son.");

- *Id.* ("I have learned a lot and have had to reevaluate how I discipline my son going forward.");

- *Id.* ("I am someone that disciplined his child and did not intend to cause him

any injury. No one can understand the hurt that I feel for my son and for the harm I caused him.

- *Id.* Ex. 29 (November 4, 2014 article) ("I truly regret the incident. I take full responsibility for my action. I love my son more than any of you know.")

151.   Indeed, Mr. Peterson personally told Mr. Henderson during the arbitration hearing that he was sorry for hurting his son and that such an incident would never happen again. Ex. 122 (*Peterson* Hr'g Tr. 133:3-23). But Mr. Henderson ignored these in person and heartfelt statements by Mr. Peterson in favor of unverified and out-of-context newspaper reports because they neither suited Mr. Henderson's narrative nor the biased result he was determined to reach. This is a classic situation in which an evident partiality disqualification is warranted.

## III.   THE ARBITRATION AWARD ALSO VIOLATES THE ESSENCE OF THE CBA BY IMPOSING UNAUTHORIZED AND *ULTRA-VIRES* FORMS OF DISCIPLINE NOT PROVIDED FOR IN THE CBA

152.   As set forth above, the Arbitration Award contravenes the "essence of the CBA" by sustaining retroactive application of the New Policy in violation of Judge Jones' "law of the shop" ruling in *Rice.*

153.   The Arbitration Award also departs from the essence of the CBA for two additional reasons: (i) the Award affirms discipline which dictates to Mr. Peterson who he must engage as medical health professionals, even though the CBA limits Commissioner discipline for conduct detrimental to suspensions or fines or termination; and (ii) the Award sanctions Commissioner Goodell's unauthorized use of the Commissioner's Exempt List to suspend Mr. Peterson without any disciplinary process, despite the absence of any authority to do so in either the CBA or even the NFL's own Constitution & Bylaws.

154.   As discussed, "[a]n arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice. He may of course look for guidance from many sources, yet his award is legitimate only so long as it draws its essence from the collective bargaining agreement." *Enterprise Wheel*, 363 U.S. at 597; *see also Misco*, 484 U.S. at 38.   When an arbitrator's award "manifests an infidelity to this obligation, courts have no choice but to refuse enforcement of the award." *Enterprise Wheel*, 363 U.S. at 597; 9 U.S.C. § 10(a)(1)-(4); *PSC Custom*, 763 F.3d at 1009; *George A. Hormel & Co. v. United Food & Comm. Workers, Local 9, AFL-CIO*, 879 F.2d 347, 352 (8th Cir. 1989) (vacating award on essence of agreement grounds).

### A.   The Commissioner Has No CBA Authority to Impose Counseling Programs as a Form of Discipline

155.   Commissioner Goodell issued discipline which conditioned Mr. Peterson's possible reinstatement upon his compliance with an unprecedented, NFL-imposed "counseling and treatment program" that appears nowhere in the CBA and has never been part of the custom and practice of the parties or the "law of the shop." Indeed, the discipline requires Mr. Peterson to submit to treatment from a psychiatrist hand-picked by the NFL and adhere to counseling, therapy and a community service program designed by *that* physician—a requirement that has never previously been imposed in any Article 46 discipline  Ex. 18 at 0035-36.

156.   Such additional disciplinary requirements are not authorized by the CBA and thus the arbitral award approving them is contrary to the essence of the CBA. Indeed, the

collectively-bargained NFL Player Contract, as well as Article 46, limits the Commissioner's disciplinary authority for conduct detrimental to the NFL to fines, suspensions or terminations. *See* Ex. 1 (CBA, Art. 46); Ex. 1A (Standard Player Contract ¶ 15). There is not a word about using conduct detrimental discipline to require players to participate in medical treatments designed by League advisors.

157.   The only document that mentions the Commissioner's new intrusive views about choosing doctors for NFL players is his New Policy. But even putting aside the separate point that the New Policy cannot be applied here, Mr. Henderson himself held that "[t]he Personal Conduct Policy is not part of the CBA. . . ." Ex. 126 (*Peterson* Arbitration Award at 6). Mr. Henderson thus improperly sustained the aspect of Commissioner Goodell's discipline concerning mandatory counseling and evaluation on the basis of the New Policy which "is not part of the CBA," while ignoring the collectively-bargained Player Contract which limits the scope of conduct detrimental discipline to specified remedies, that do not include mandatory participation in NFL-run counseling programs.

158.   The Commissioner's unprecedented and *ultra vires* "counseling and treatment" requirement as part of Mr. Peterson's discipline—sustained by the Arbitration Award—constitutes an unlawful addition to the Commissioner's cabined disciplinary authority under the CBA, warranting vacatur of the Award. *See, e.g, Int'l Union of Operating Eng'rs, AFL-CIO, Local No. 670 v. Kerr-McGee Ref. Corp.*, 618 F.2d 657, 660 (10th Cir. 1980) (vacating arbitration award because arbitrator had "violated the essence of the agreement" when he "added an additional condition or requirement not in the contract . . . [and] not bargained for" and imposed it on a party to the arbitration).

**B.     The Commissioner Has no CBA Authority to Use the Exempt List as a Form of Immediate Discipline Without any Article 46 Process**

159.    The Arbitration Award also violates the essence of the agreement by ratifying, in a single, perfunctory, twelve-word sentence, the Commissioner's unprecedented use of the Commissioner's Exempt List as a disciplinary mechanism, despite the text of the NFL Constitution & Bylaws, past practice of the use of the List, and his own understanding that the List is not a disciplinary tool.  Ex. 126 (*Peterson* Arb. Award at 8) ("I reject the argument that placement in Commissioner Exempt status is discipline.").

160.    When Mr. Peterson's criminal case was formally resolved on November 4, 2014, he was legally entitled under the CBA to return to the Vikings unless and until the NFL disciplined him.  Prior to that time, Mr. Peterson had voluntarily agreed to spend time on the Commissioner's Exempt List with the agreement of the union, but that agreement expired once his criminal proceedings were over.

161.    The NFL thereafter decreed, on November 6, 2014, that Mr. Peterson's "status on the Reserve/Commissioner Exempt list will remain unchanged" until the Commissioner determined his discipline, a deadline which was subsequently extended in Mr. Peterson's discipline letter to keep Mr. Peterson on the Commissioner's Exempt List until any disciplinary appeals had been exhausted.  Ex. 5 at 0013; *accord* Ex. 18 at 0036. By imposing such a suspension (albeit with pay), the NFL violated Mr. Peterson's CBA rights to appeal discipline and have a hearing before any discipline could be imposed.  Such

use of the Commissioner's Exempt List, upheld in the Arbitration Award, is contrary to the essence of the CBA.

162.    Nowhere in the CBA is there a provision authorizing the Commissioner to force a player to stay away from his team on the Commissioner's Exempt List prior to discipline being imposed under the procedures of Article 46. To the contrary, the terms of Article 46 make it clear that there can be no Commissioner discipline of players other than through its procedures. Ex. 1 (CBA, Art. 46) ("All disputes . . . involving action taken against a player by the Commissioner for conduct detrimental . . . will be processed *exclusively* as follows. . . .") (emphasis added).

163.    Further, even the NFL Constitution & Bylaws, which defines the use and the scope of the Commissioner's Exempt List, does not provide for the List to be used in the disciplinary manner applied to Mr. Peterson. To the contrary, the express terms provided for in the NFL Constitution & Bylaws indicates that the Commissioner Exempt List is not a means of discipline or suspension but simply a mechanism by which the Commissioner can grant a request of a Club to exclude a player from its maximum number of Active Players while the player is not available to play for the team. Ex. 124 (NFL Const. & Bylaws, Art. XVII, § 17.14(A)) (instructing teams to make any "request for an Exemption" to the Commissioner "by NFLNet, e-mail, facsimile or other similar means of communication"). There is no provision for the Commissioner to use the list as a means of putting a player on paid suspension while discipline decisions are made. SOF III.A, *supra*.

164.   Incredibly, Mr. Henderson sanctioned the Commissioner's use of the Exempt List for disciplinary purposes despite admitting during the hearing that in his decades working for the NFL he had never heard of it being used for such purposes. Ex. 122 (*Peterson* Hr'g Tr. 136:5-12) (Henderson) ("I, for one, am not familiar with this particular [disciplinary] use of the Commissioner's exempt list and I would like to hear some explanation of that."); *see also id.* 142:3-22.

165.   The latest revised version of the New Policy, promulgated on December 10 by the NFL, announces that the Commissioner's Exempt List will be used for interim disciplinary purposes in the future, but that New Policy—which itself constitutes a CBA violation—cannot possibly apply retroactively to Mr. Peterson. And even this purported New Policy—unilaterally announced and promulgated by the NFL—cannot change the fact that such a use of the Commissioner's Exempt List is contrary to the essence of the CBA and even the NFL Constitution & Bylaws, which nowhere provide for such a pre-hearing disciplinary punishment for NFL Players.

166.   Nor is there any basis for the view that being put involuntarily on the Commissioner Exempt List is not a form of discipline. As even Mr. Vincent testified, being deprived of the ability to play, even while receiving salary, is a major punishment for an NFL Player given his "short shelf life." Ex. 122 (*Peterson* Hr'g Tr. 205:9-206:20). This is why, as previously noted, numerous courts in this District have found that missing any games causes irreparable harm to NFL Players. *Supra* n.12.

167.   Further, by failing to treat the games for which Mr. Peterson was banished to the Commissioner's Exempt List as a suspension, the Arbitration Award further violated

the essence of the CBA by sustaining an even more wildly disparate punishment of Mr. Peterson. All-in, instead of the maximum two-game suspension for first-time domestic violence offenders that applies under the Previous Policy, Mr. Peterson has been subjected to discipline that will cause him to miss a minimum of seven games this season—the combination of the compulsory time on the Commissioner's Exempt List and the suspension—with no definitive end in sight.

## PRAYER FOR RELIEF

## VACATUR OF ARBITRATION AWARD

168. The NFLPA repeats and re-alleges all of the foregoing Paragraphs as if fully set forth herein.

169. The NFLPA requests that this Court vacate the Arbitration Award.

170. The Arbitration Award must be vacated because it violates the essence of the CBA, exceeded the Arbitrator's authority, and defies the requirements of fundamental fairness, notice, and consistency.

171. The Arbitration Award must be vacated for the additional reason that Arbitrator Henderson is evidently partial.

172. The Arbitration Award must also be vacated because it approves discipline and a disciplinary process that was contrary to the plain requirements and authority of the CBA and thus is, for this reason as well, contrary to the "essence of the CBA.

173. The Arbitration Award should be set aside for each of these independent reasons.

WHEREFORE, in accordance with Section 301 of the LMRA, 29 U.S.C. § 185 and

9 U.S.C. §§ 10(a)(2)-(4), the NFLPA and Mr. Peterson request that this Court vacate the

Arbitration Award in its entirety and grant such other and further relief as the Court may

deem just and proper, including an order declaring that Mr. Peterson is entitled immediately

to be reinstated as a player in the National Football League because he has already served

far more than the maximum two-game suspension that could have been imposed under the

CBA.

Dated: December 15, 2014                     Respectfully submitted,

                                             By: _Barbara Podlucky Berens_

                                             BERENS & MILLER, P.A.
                                                Barbara Podlucky Berens, #209788
                                                Justi Rae Miller, #387330
                                                Carrie L. Zochert, #291778
                                                3720 IDS Center
                                                80 South Eighth Street
                                                Minneapolis, MN 55402
                                                612-349-6171
                                                bberens@berensmiller.com

                                             WINSTON & STRAWN LLP
                                             Jeffrey L. Kessler (*pro hac vice pending*)
                                             David L. Greenspan (*pro hac vice pending*)
                                             Jonathan J. Amoona
                                             Angela A. Smedley
                                             200 Park Avenue
                                             New York, New York 10166
                                             Telephone: (212) 294-6700
                                             Facsimile: (212) 294-4700
                                             jkessler@winston.com
                                             dgreenspan@winston.com
                                             jamoona@winston.com
                                             asmedley@winston.com

NATIONAL FOOTBALL LEAGUE
PLAYERS ASSOCIATION
DeMaurice F. Smith *(pro hac vice
pending)*
1133 20th Street, NW
Washington, DC 20036
202-756-9136
demaurice.smith@nflplayers.com

74