## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

NATIONAL FOOTBALL LEAGUE
PLAYERS ASSOCIATION, on its own
behalf and on behalf of ADRIAN
PETERSON,

                  Plaintiff,

    v.

NATIONAL FOOTBALL LEAGUE and
NATIONAL FOOTBALL LEAGUE
MANAGEMENT COUNCIL,

                Defendants.

CASE NO. 14-cv-4990-DSD-JSM

**DEFENDANTS' OPPOSITION TO
PLAINTIFF'S PETITION TO
VACATE ARBITRATION AWARD**

---

## INTRODUCTION

Plaintiff the National Football League Players Association ("NFLPA" or "Union"),

on behalf of Minnesota Vikings running back Adrian Peterson, has filed this action

challenging the National Football League's ("NFL") disciplinary suspension of Peterson

for the criminal abuse of his four-year-old son.  Peterson appealed that suspension under

the applicable procedures set forth in the collective bargaining agreement ("CBA")

negotiated between the NFL and the Union.  Following a hearing before a properly

designated Hearing Officer at which Peterson was represented by counsel and afforded

the right to present evidence and argument in support of his appeal, the Hearing Officer

denied Peterson's appeal and upheld the suspension in a written opinion ("Award") that is

"final and binding" on Peterson and his Union.  The NFLPA now asks this Court to

vacate the Award and immediately reinstate Peterson to the NFL based on arguments that

were all considered and specifically rejected in the arbitration proceeding below.  Federal

labor law, which governs this action, completely forecloses the Union's request.

First, although the NFLPA claims this is the "rare" case in which a federal court

may intervene in a labor arbitration, the arguments that it offers in support of that claim

show that it is nothing of the sort.  To the contrary, the Union's lengthy recitations of the

evidence, and its implicit request that the Court review the record and determine that the

Hearing Officer's factual findings were incorrect, is exactly the type of challenge to an

arbitration award that is *not* permitted.  *E.g.*, *Major League Baseball Players Ass'n v.*

*Garvey*, 532 U.S. 504, 509 (2001) ("'[I]mprovident, even silly, factfinding' does not

provide a basis for a reviewing court to refuse to enforce the award.") (internal citation

omitted); *Electrolux Home Prods. v. UAW*, 416 F.3d 848, 853 (8th Cir. 2005) (courts "not

authorized to reconsider the merits of an award even though the parties may allege that

the award rests on errors of fact or on misinterpretation of the contract").

Similarly, the Union's arguments that Peterson's suspension is not permitted by the

text of the CBA or the "law of the shop" – all of which were carefully considered and

rejected by the Hearing Officer below – are exactly the type of interpretative disputes that

are for the arbitrator to resolve and may not be challenged in court.  *See United*

*Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 37-38 (1987) (Courts do not "sit to

hear claims of factual or legal error by an arbitrator as an appellate court does in

reviewing decisions of lower courts.").  An arbitration award draws its essence from the

parties' agreement and thus cannot be vacated where, as here, the Hearing Officer

"'arguably constru[ed] or appl[ied] the agreement.'"  *Williams v. Nat'l Football League*, 582 F.3d 863, 883 (8th Cir. 2009) (citations omitted).

The NFLPA's assertion that the Award should be vacated on fundamental fairness grounds is equally meritless.  Fundamental unfairness has never been recognized in the Eighth Circuit as a basis for vacating a labor arbitration award.  Even in those courts where fundamental unfairness has been applied, it is a basis for vacating an award only where the unfairness affects the conduct of the hearing itself.  The Union does not even attempt to argue that the hearing here was fundamentally unfair; nor does it cite any authority (nor can it) to support its assertion that challenges to the imposition of the underlying discipline could subject an award to vacatur based on fundamental fairness.

Nor can the Union demonstrate that the Award should be vacated based on the claim that the Hearing Officer was "evidently partial."  The NFL and the NFLPA expressly bargained for an appeal procedure that authorizes the Commissioner to designate a Hearing Officer of his choice in cases where a player has been disciplined for engaging in conduct detrimental to the NFL.  As established by binding Circuit precedent involving the same parties and a materially identical arbitration procedure, the NFLPA cannot now complain that the Commissioner's exercise of that right provides a basis for vacatur.  In any event, the NFLPA has expressly conceded that its claim is based solely on the supposed appearance of bias, as opposed to actual bias, and under binding precedent the mere appearance of bias is insufficient to vacate an arbitration award.

The Petition to Vacate the Award should be denied.

## STATEMENT OF FACTS

### A.    The Commissioner's Authority To Discipline Players For Conduct Detrimental to the NFL

Article 46 of the CBA provides the NFL Commissioner with the authority to discipline players for "conduct detrimental to the integrity of, or public confidence in, the game of professional football."  Petition to Vacate Arbitration Award ("Pet.") Ex. 1.  This authority derives from the NFL Constitution and Bylaws, which are incorporated into the CBA and "authorize" the Commissioner to "take or adopt appropriate legal action or such other steps or procedures as he deems necessary and proper in the best interests of either the League or professional football, whenever [any player] is guilty of any conduct detrimental either to the League, its member clubs or employees, or to professional football."  Declaration of Joseph G. Schmitt ("Schmitt Decl.") Ex. A (2010 NFL Constitution and Bylaws) Rule 8.6.  This includes the "complete authority" to discipline a player for conduct detrimental to the League, *id.* at Rule 8.13(A), including by imposing fines, suspending players for definite periods "or indefinitely," and/or terminating a Player's Contract.  Pet. Ex. 1A (NFL CBA, App. A) ¶ 15.

Pursuant to his authority under Article 46, the Commissioner has promulgated a Personal Conduct Policy ("Policy") that provides the standards of behavior that players and other employees of the NFL and its thirty-two clubs are expected to follow.  Pet. Ex. 2.  The Policy provides that Players and others involved with the League or the clubs will be subject to discipline for a variety of conduct, including "[c]riminal offenses . . . involving: the use or threat of violence; domestic violence and other forms of partner

abuse" and "[c]onduct that undermines or puts at risk the integrity and reputation of the

NFL, NFL clubs, or NFL players." *Id.* at 1.  The Policy confirms the Commissioner's

authority to impose "fines, suspension, or banishment from the League" and allows the

Commissioner to impose "a probationary period and conditions that must be satisfied

prior to or following reinstatement." *Id.* at 2.  Since 2007, the Policy also has included a

section called "Evaluation, Counseling and Treatment" providing that

> Apart from any disciplinary action, persons arrested, charged or
> otherwise appearing to have engaged in conduct prohibited under
> this policy generally will be required to undergo a formal clinical
> evaluation.  Based on the results of that evaluation, the person may
> be encouraged or required to participate in an education program,
> counseling or other treatment deemed appropriate by health
> professionals.

*Id.* at 1-2.

Players who are disciplined for violating the Policy have the right to appeal to the

Commissioner or his designated hearing officer.  Pet. Ex. 1A (Player Contract) ¶ 15; Pet.

Ex. 1 (CBA Art. 46) §§ 1(a), 2; Pet. Ex. 2 (Policy) at 2.  The decision on appeal

"constitute[s] full, final and complete disposition of the dispute" and is "binding upon the

player(s), Club(s)," the NFL, and the Union.  Pet. Ex. 1 (CBA Art. 46) §2(d).

In August 2014, the Commissioner issued a memorandum to all NFL personnel,

including players, announcing that the League would be providing additional resources in

the area of domestic violence.  Pet. Ex. 3, 29 at C ("August 2014 Letter").  He also

explained that NFL personnel who engage in domestic violence in violation of the Policy

will be subject to increased discipline.  *Id.*

B.      **Peterson's Discipline Under The Policy**

On November 18, 2014, the Commissioner suspended Peterson for engaging in conduct detrimental to the NFL in violation of the Policy.  Pet. Ex. 126 (Award) at 1. Peterson's discipline arose out of his admitted criminal physical abuse of his four-year-old son in May 2014 at his Texas residence.  *Id.* at 1.  An indictment issued by a Texas grand jury in September alleged that "on May 18, 2014, Mr. Peterson repeatedly struck his four-year old son with a branch from a tree, inflicting multiple welts and lacerations on the child's legs, hands, buttocks and back, and bruises and abrasions on his scrotum." *Id.*  A warrant was issued for Peterson's arrest, and he surrendered to authorities in Texas the next day.  *Id.*  The League first became aware of the allegations against Peterson in September after the indictment was issued.  Pet. Ex. 122 (H'rg Tr.) 59:8-11.

Following Peterson's arrest, on September 18, 2014, Peterson, the NFLPA, and the League entered into an agreement to place Peterson on paid leave pending resolution of his criminal case (hereafter the "Letter Agreement").  Pet. Ex. 126 (Award) at 2. Specifically, they agreed he would be placed on the "Commissioner's Exempt" list, a designation the Commissioner may assign to a player that allows the club to use the player's roster spot for a different player while still entitling the player on the Exempt list to receive payments under his contract.  *Id.*; Pet. Ex. 124 (2010 NFL Constitution & Bylaws) Art. XVII § 17.14(A).  The Letter Agreement specifically contemplated that the NFL would consider imposing discipline on Peterson once his criminal charges were resolved.  Schmitt Decl. Ex. B (Sept. 18, 2014 Letter Agreement).

On November 4, Peterson pleaded *nolo contendere* to "reckless assault." Pet. Ex. 126 (Award) at 2. Two days later, the League notified Peterson by letter that it was considering imposing discipline under the Policy and requested that Peterson provide information about his criminal case. Pet. Ex. 5 (Nov. 6, 2014 Letter from A. Birch to A. Peterson). The League also informed Peterson of its intent to schedule a meeting with Peterson, the Commissioner, and other individuals to determine the extent of Peterson's discipline, and to give Peterson an opportunity to present arguments regarding potential discipline. *Id.* Finally, the letter informed Peterson that his status on the Commissioner's Exempt list would remain unchanged, and he would continue to be paid, pending a determination on the discipline to be imposed. *Id.*

The Union objected to Peterson's continued placement on the Commissioner's Exempt list and filed an expedited non-injury grievance under Article 43 of the CBA. Schmitt Decl. Ex. C (Peterson Non-Injury Grievance). The Union claimed that, without Peterson's agreement, the Commissioner had no authority to keep Peterson on the Commissioner's Exempt list. *Id.* Arbitrator Shyam Das, a neutral arbitrator appointed by the parties under the terms of the CBA, denied the grievance in an award issued on November 18, 2014. Schmitt Decl. Ex. D (*In re Adrian Peterson* (Nov. 18, 2014) (Das, Arb.)). In particular, Arbitrator Das held that the League had not "violated . . . the Collective Bargaining Agreement by continuing to retain Peterson on the Commissioner-Exempt list during the period in which it was reviewing his conduct for potential disciplinary action under the" Policy. *Id.* at 6.

On November 11, the League notified Peterson that a meeting was scheduled for November 14 because the "matter presents a possible violation of the league's conduct policies which warrants a review for potential disciplinary action." Pet. Ex. 6 (Nov. 11, 2014 Letter from A. Birch to A. Peterson). The NFLPA objected to the meeting on the grounds that the date did not work and that it included outside individuals who would be advising the Commissioner on the appropriate amount of discipline to impose. Pet. Ex. 12 (Nov. 13, 2014 Letter from H. McPhee to A. Birch). The League offered to move the meeting to the next day and to allow Peterson and the Union to participate by teleconference. Pet. Ex. 126 (Award) at 2-3. It also assured the Union that the meeting would be similar to prior pre-disciplinary meetings with the Commissioner. *Id.* The Union and Peterson refused to participate. *Id.*

On November 18, 2014, the Commissioner notified Peterson that he was suspended without pay for the remainder of the 2014 football season and fined an amount equal to six weeks' pay. *Id.* at 1. The Commissioner based the discipline on Peterson's November 4 plea of *nolo contendere* to "reckless assault" arising out of his criminal child abuse. Pet. Ex. 18 (Peterson Art. 46 Discipline Letter) at 1-2. The Commissioner found several aggravating factors justifying the discipline, including that Peterson's child was only four years old; that he used a tree switch, which was the functional equivalent of a weapon; and that he had shown no meaningful remorse for his conduct. *Id.* at 3. In addition, the Commissioner explained, "it appears that this is not the first time that you have punished children in this way. Public statements attributed to you indicate that you believe that this kind of discipline is appropriate and that you do not intend to stop

8

disciplining your children this way." *Id.* at 2.  Because "[t]he well-being of [Peterson's] children is of paramount concern," the Commissioner also required Peterson to participate in counseling with a respected doctor experienced in treating individuals involved in child abuse. *Id.* at 3-4.  Assuming Peterson's cooperation with counseling and no further violations of the Policy, the Commissioner explained that Peterson would be eligible for reinstatement beginning April 15, 2015. *Id.* at 4.

### C.     Peterson Appeals His Discipline

The next day, November 19, Peterson appealed his suspension pursuant to the terms of the CBA and Policy.  Pet. Ex. 20 (Peterson Notice of Appeal of Art. 46 Discipline).  On November 21, the League notified Peterson and the NFLPA that the Commissioner had designated Harold Henderson, who has served as a hearing officer in numerous appeals under the Policy, as well as appeals under the collectively bargained Drug and Steroid Policies, to hear the appeal.  Pet. Ex. 21 (Nov. 21, 2014 Letter from A. Birch to T. DePaso).  On November 25, the NFLPA wrote to Henderson requesting that he recuse himself because of his employment with the League, including his prior position as Executive Vice President of Labor Relations, and the fact that he still is employed part-time and paid by the League.  Pet. Ex. 22 (Nov. 25, 2014 Letter from J. Kessler to H. Henderson).

Hearing Officer Henderson denied the recusal motion on November 28.  He explained that he had "no preconceived notions about the facts in the case, and no information beyond the media reports available to the public."  Pet. Ex. 121.  He found that the CBA provides no limitations on whom the Commissioner can designate to serve

as hearing officer in an appeal under the Policy and that there is no basis to impose "any limitation or qualification on the commissioner's ability to appoint designees who have, or have had in the past, an employment relationship with the league." *Id.* Moreover, given his "history of hearing dozens of player appeals, nearly all of which had NFLPA participation without objection to my serving as arbitrator, it is late to complain now and any such objection is waived." *Id.* Thus, he concluded, "the motion for recusal does not meet the heavy burden of showing prejudice or bias, and [] there is no adequate support offered for a showing of evident partiality. I am fully confident that I can provide a fair and impartial appeal hearing for Peterson in full compliance with all the requirements of the CBA and applicable law." *Id.*

### D.      Peterson's Appeal Hearing

A hearing was held on December 2 and 4, 2014 before Henderson. Although the NFLPA conceded that Peterson's conduct constituted "conduct detrimental" in violation of the Policy, it made three arguments as to why the discipline should be reduced. Pet. Ex. 126 (Award) at 3.

First, the Union claimed that the League improperly applied a "new" policy to Peterson. *Id.* The Union argued that Peterson could not be subject to the enhanced discipline for domestic violence announced by the Commissioner in August 2014 because he committed his assault prior to that announcement. *Id.* at 3-6. Relying on discipline imposed on players before August 2014, in cases the Union claimed were comparable, the NFLPA argued that Peterson could be subject to no more than a "two-game

maximum" suspension for his conduct.  Pet. Ex. 122 (H'rg Tr.) 32:22-36:7; *see also id.* 55:15-56:2.

Second, the Union claimed that Peterson's discipline was increased in retaliation for his refusal to participate in the November 14 meeting with the Commissioner and the "experts" who would be advising him in imposing discipline.  Pet. Ex. 126 (Award) at 6. Peterson claimed that Troy Vincent, a League official, had promised Peterson that his discipline would be limited to two games if he attended the meeting.  *Id.* at 6-7.  The NFLPA relied on recordings and transcripts of telephone conversations between Peterson and Vincent that were recorded without Vincent's knowledge.  *Id.* at 6-7.  The Union claimed Peterson's discipline was increased because he did not attend the meeting and "that the discipline here was an attempt to punish [Peterson] for refusing to agree to provisions in a policy that was never collectively bargained and never understood" and was a new process not agreed to in the Policy.  *Id.* at 6.  The NFLPA sought to compel Vincent's testimony, which the League opposed.  Pet. Ex. 24 (Nov. 26, 2014 Letter from J. Kessler to A. Birch); Schmitt Decl. Ex. E (Dec. 1, 2014 Letter from D. Nash to H. Henderson).  The Hearing Officer granted the NFLPA's request to compel Vincent's testimony, and Vincent testified at the hearing.  Pet. Ex. 122 (H'rg Tr.) 141:4-10.

Finally, the Union raised a number of additional arguments regarding the Commissioner's authority to impose discipline, including that Peterson could not be required to engage in mandatory evaluation and counseling, *id.* 44:21-48:21, and could not remain on paid leave following resolution of his criminal charges, *see id.* 109:2-11, 136:13-138:1, 142:3-143:12.

###### E.     The Arbitration Award

On December 12, 2014, the Hearing Officer issued his Award affirming the discipline.  Pet. Ex. 126.  In doing so, he rejected all of Peterson's arguments.  *Id.*

The Hearing Officer rejected Peterson's assertion that the League had improperly applied a "new" policy.  *Id.* at 3-4.  The Hearing Officer reviewed both the Policy and the Commissioner's August 2014 Letter regarding enhanced discipline and explained "[t]hat careful reading leaves me convinced that the August communications do not constitute a change of the [Policy], but rather reinforce that policy with initiatives to explain and enhance it."  *Id.*[1] Given the "brutal" and "egregious" nature of the conduct and the Commissioner's "broad discretion" to impose discipline, the Hearing Officer also found that he had no reason to decide whether the discipline was imposed under the enhanced discipline described in the August 2014 Letter or the Policy in effect prior to August, as the discipline would have been justified in either case.  *Id.* at 5.

The Hearing Officer further rejected the argument that Peterson was not properly afforded notice of the discipline that could be imposed, even if it was imposed under the "new" policy.  *Id.* at 5.  "[T]here is no indication that [Peterson] ever relied in any way on the level of discipline that would be imposed for conduct such as his.  His counsel never suggested that Mr. Peterson might not have inflicted those injuries on his young son if he had known he could be suspended six weeks rather than two."  *Id.* at 5-6.

------

[1] Although the Policy went into effect on June 1, 2014, shortly after Peterson struck his child, the Hearing Officer found undisputed that this Policy "is identical to the previous version for 2013."  Pet. Ex. 126 (Award) at 4.

The Hearing Officer also rejected Peterson's argument that the discipline was too harsh as compared to past cases of player misconduct. Applying prior arbitration precedent under the Policy, the Hearing Officer held that "[t]he Commissioner has broad discretion to impose appropriate discipline for violations of the Personal Conduct Policy" and "is not forever bound to historical precedent." *Id.* at 4. The Hearing Officer specifically cited the holding in *In re Ray Rice* (Nov. 28, 2014) (Jones, Arb.), issued less than one month earlier, that if the Commissioner had indefinitely suspended a player for serious misconduct relating to domestic violence, "an arbitrator would be hard pressed to find that the Commissioner had abused his discretion." *Id.* at 4-5 (citing *Rice*). Henderson acknowledged that Peterson's suspension was lengthier than in many past domestic violence cases, but also found that

> this is arguably one of the most egregious cases of domestic violence in this Commissioner's tenure – the severe beating of a four year old child, with a tree branch, striking him repeatedly about the body and inflicting injuries visible days later . . . . While this particular offense is rare among NFL employees, the discipline imposed here is consistent with that in the most egregious violations of the Policy. There is no comparing this brutal incident to the typical violence against another adult. Therefore, I find no basis to conclude, as the player's counsel has argued, that the discipline imposed is either unfair or inconsistent.

*Id.* at 5.

The Hearing Officer also found no merit to the "retaliation" argument. He rejected the argument that, by noticing a pre-disciplinary hearing with outside experts, the League in any way violated the CBA or NFL Player Contract. *Id.* at 6. Interpreting the relevant provisions in the CBA and Contract, he concluded that there was no "right" to any

pre-disciplinary hearing at all – nor any limitations on whom the Commissioner may

invite to such a hearing – and that the Commissioner, in certain instances, had simply

provided players *an opportunity* to present evidence about their circumstances prior to his

imposing discipline. *Id.* at 6. The only right to a hearing, the Hearing Officer found, was

reflected in Article 46 of the CBA, which provides that a player has a right to appeal any

discipline ultimately imposed under the Policy. *Id.* He also rejected Peterson's argument

that he was subject to retaliation for failing to attend the scheduled pre-disciplinary

hearing. He found that Vincent did not promise Peterson that he would be suspended

only two games in exchange for attending the pre-disciplinary hearing, or that anyone

from the League either instructed Vincent to take that message to Peterson or was aware

of what Vincent and Peterson discussed. *Id.* at 7. Rather, the Hearing Officer concluded

that Vincent encouraged Peterson to attend the hearing in an effort to help Peterson put

the matter behind him and suggested only that "[a]ll things were to be considered." *Id.*

Thus, the Hearing Officer held, "I do not find sufficient evidence to support the

conclusion that the discipline imposed on Mr. Peterson was retaliatory." *Id.* at 8.

Finally, the Hearing Officer specifically rejected the Union's arguments that the

Commissioner had exceeded his authority or violated the CBA in requiring Peterson to

seek counseling, *see id.* at 5, or by placing Peterson on the Commissioner's Exempt list

pending the resolution of his criminal charges and the NFL's investigation, *see id.* at 8.

Applying the law of the shop, the Hearing Officer held that (1) neither counseling nor

paid leave was disciplinary, (2) the existing Policy gave the Commissioner explicit

authority to require counseling, *id.* at 5, and (3) Peterson's placement on the

Commissioner's Exempt list did not violate the CBA, *id.* at 2.

### F. The Union's Lawsuit

Although the Hearing Officer's Award is "final" and "binding" under the terms of

the Policy (Pet. Ex. 1(CBA Art. 46)), on December 15, 2014, the NFLPA filed a

"Petition" to vacate the Award. Petition to Vacate Arbitration Award, ECF No. 1. The

NFLPA, on behalf of Peterson, seeks to re-argue the merits of Peterson's appeal hearing

and asserts that the Award should be vacated because: (1) the Award "departs from the

'essence of the CBA'" and is fundamentally unfair because it retroactively applies the

new, enhanced disciplinary requirements of the Policy to Peterson; (2) Henderson

"exceeded his authority" by concluding that the discipline would have been authorized

even under the old Policy; (3) Henderson was "evidently partial;" and (4) the Award fails

to draw its essence from the CBA because it sustains discipline that was not collectively

bargained. Pet. ¶¶ 29-33. There is no dispute that the Union made all of these arguments

below. *See* Pet. ¶¶ 107 ("evidently partial" argument); 109 (all other arguments).[2]

---

[2] On January 5, 2015, the Court granted Plaintiff's motion to conform and to enlarge word limits, allowing Plaintiff's 74-page Petition to serve as its motion to vacate and permitting Plaintiff to file a reply brief not to exceed 4,000 words. The Court further stated that it would entertain a request by Defendants to enlarge the word limits applicable to its brief in opposition to Plaintiff's Petition to vacate the Award. While this brief does not exceed the word limit set forth in Local Rule 7.1(f), Defendants reserve their right to file a motion for leave to request a surreply, not to exceed 4,000 words, in response to Plaintiff's reply brief.

## ARGUMENT

### I.   STANDARD OF REVIEW

The Court's review of the Award entered in this labor dispute is "among the narrowest known to law."  *Union Pacific R.R. v. Sheehan*, 439 U.S. 89, 91 (1978) (per curiam).  Labor arbitration awards are entitled to "extreme judicial deference," *Am. Nat'l Can Co. v. United Steelworkers of Am.*, 120 F.3d 886, 890 (8th Cir. 1997), with all doubts "resolved in favor of the arbitrator's award," *Walsh v. Union P. R.R.*, 803 F.2d 412, 414 (8th Cir. 1986).

The Union's petition to vacate arises under Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185.  That statute "reflect[s] a decided preference for private settlement of labor disputes without the intervention of government."  *Misco*, 484 U.S. at 37; *see id.* at 36 (allowing courts to revisit arbitration arguments would "undermine[]" the "federal policy of settling labor disputes by arbitration"); *see also* 29 U.S.C. § 173(d) (binding arbitration is the "desirable method for settlement of grievance disputes arising over the application or interpretation of an existing collective-bargaining agreement").[3]

"As long as the arbitrator's award 'draws its essence from the collective bargaining agreement,' and is not merely 'his own brand of industrial justice,' the award

---

[3] Plaintiff seeks to vacate the Award under both the LMRA and the FAA.  To the extent it applies, the FAA does not prescribe a "different" or "more vigorous" standard of review than the LMRA.  *Alcan Packaging Co. v. Graphic Commc'n Conference, Int'l Bhd. of Teamsters & Local Union No. 77-P*, 729 F.3d 839, 841 (8th Cir. 2013).  Moreover, "[i]f there were a conflict between the statutes," the Eighth Circuit "would apply [the LMRA], because it is a specific directive to create the substantive law that governs collective bargaining agreements, and the specific governs over the general."  *Id.*

is legitimate" and cannot be vacated. *Misco*, 484 U.S. at 36 (quoting *Steelworkers v. Enter. Wheel & Car Corp.*, 363 U.S. 593, 597 (1960)). An award "draws its essence" from the agreement if "the arbitrator is even arguably construing or applying the agreement." *Williams*, 582 F.3d at 883 (citations omitted). He is thus free to choose from one of any "plausible" interpretations of the agreement, unless that choice is "completely irrational." *See McGrann v. First Albany Corp.*, 424 F.3d 743, 749-52 (8th Cir. 2005); *Ozark Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l*, 744 F.2d 1347, 1351 (8th Cir. 1984) (refusing to set aside arbitration award by panel that "did nothing more than give admittedly ambiguous language a construction at least as plausible as any other suggested"); *Horton, Inc. v. NSK Corp.*, 544 F. Supp. 2d 817, 824, 827 (D. Minn. 2008) (upholding arbitration award where panel's "ultimate construction of the contract was plausible"). Unless it can be said with "positive assurance" that the agreement "is not susceptible of the arbitrator's interpretation," an award cannot be set aside. *United Food & Commercial Workers, Local No. 88 v. Shop 'N Save Warehouse Foods, Inc.*, 113 F.3d 893, 895 (8th Cir. 1997) (internal citations omitted); *Am. Nat. Can Co.*, 120 F.3d at 889 (court may not ask whether it "would have awarded this particular relief, or whether the arbitrator correctly interpreted the contract") (quotations omitted).

   In determining whether an arbitrator's award draws its essence from the CBA and governing policies, courts "have absolutely no authority to reconsider the merits of an arbitration award, even when the parties allege the award rests on factual errors or on a misinterpretation of the underlying contract." *McGrann*, 424 F.3d at 748. Absent "fraud" or "dishonesty," even a court convinced that the arbitrator "committed serious

error" cannot "overturn [the arbitrator's] decision." *Misco*, 484 U.S. at 38. "While this standard may seem harsh to parties who lose in arbitration, this standard is justified because it is exactly what the parties mutually agreed upon by electing arbitration over judicial resolution of their conflicts." *Electrolux Home Prods. v. UAW*, 416 F.3d 848, 853 (8th Cir. 2005).

## II.   THE AWARD DRAWS ITS ESSENCE FROM THE COLLECTIVE BARGAINING AGREEMENT

Plaintiff asserts that the Award should be vacated because, among other reasons, it allegedly affirms "retroactive" discipline and violates the "law of the shop" as interpreted in prior arbitration decisions under the Policy and the CBA. Pet. ¶¶ 112-131. These allegations should be rejected as an impermissible attempt to re-litigate the Hearing Officer's factual and legal findings, and because Plaintiff cannot prove the Award does not "draw its essence" from the Policy and the CBA.

The LMRA's exceedingly deferential standard of review means that, as long as the Award "draws its essence" from the CBA – that is, as "long as the arbitrator is even arguably construing or applying the agreement," *Williams*, 582 F.3d at 883 – no further judicial review is required or permitted. Yet Plaintiff's 74-page Petition amounts to nothing more than a transparent effort to re-litigate all of the issues the Hearing Officer decided: the Union filed with this Court every exhibit it introduced below (Pet. at 1 n.1); it asks the Court to make witness credibility determinations that the Hearing Officer already made (Pet. ¶ 129 (disputing Hearing Officer's finding that witness Troy Vincent was "cand[id]" and "honest[]")); and it quarrels with multiple findings of fact by the

Hearing Officer (*e.g.*, Pet. ¶ 136 (arguing that one of his findings – that Peterson's case "is arguably one of the most egregious cases of domestic violence in this Commissioner's tenure" – is "pure hyperbole . . . entitled to no weight"). But none of these factual findings can be questioned here. *Garvey*, 532 U.S. at 509 (noting that "'improvident, even silly, factfinding' does not provide a basis for a reviewing court to refuse to enforce the award") (quoting *Misco*, 484 U.S. at 39).

As for Hearing Officer's legal conclusions, the Union never contends that he was not at least "arguably construing or applying" the CBA and Policy. Nor could it. Instead, the Union recycles the arguments raised before the Hearing Officer below, contending that the Award improperly affirms discipline that allegedly (1) is "retroactive" (Pet. ¶¶ 112-123); (2) is in excess of the "maximum suspension of two games without pay" (Pet. ¶¶ 132-140); and (3) includes "unauthorized" counseling and leave-without-pay disciplinary measures (Pet. ¶¶ 152-167). *See* Pet. ¶ 109 (admitting that all three of these arguments were made, essentially verbatim, before the Hearing Officer). But once again, none of these contentions would provide a basis to vacate an arbitration award even if the arbitrator had "committed serious error." *Misco*, 484 U.S. at 38.

*First*, Plaintiff asserts, as it did below, that the Commissioner impermissibly applied a "new" disciplinary policy. The Hearing Officer explicitly rejected that argument based on a "careful reading" of both the existing Policy and the August 2014 Letter. He concluded that the Commissioner had "broad discretion" under the CBA and Policy to impose the enhanced discipline announced in August 2014 to Peterson in the Commissioner's disciplinary decision issued in November. Pet. Ex. 126 (Award) at 4.

The Hearing Officer also independently rejected the argument because he concluded that it made no difference whether Peterson was disciplined under the supposedly "new" Policy instead of the existing one because the discipline was fully authorized – and thus equally "fair and consistent" – under both policies.  That holding was based on the Hearing Officer's interpretation of the Policy and cannot be second-guessed here.  *Id.* at 5; *see id.* (the discipline Peterson received "fits either or both [policies], and one need not pick one or the other to conclude that it was 'fair and consistent'").[4]

*Second*, Plaintiff asserts that the Award should be vacated because the Hearing Officer "simply ignores" the "law of the shop" by failing to follow the *Rice* decision and other cases on the issue of whether the "new" policy could be retroactively applied to Peterson's conduct.  To the contrary, the Arbitrator did not "ignore" *Rice*; the Award cites and distinguishes that decision, including on the issue of whether Peterson's discipline could be considered "retroactive."  Specifically, the Hearing Officer found that *Rice* "differs from this [case] in that it turned on a second, later discipline more severe

[4] Plaintiff also contends that the Hearing Officer "exceeded his authority as an arbitrator under the CBA" (Pet. ¶¶ 30, 37 (citing 9 U.S.C. § 10(a)(4)) by considering the validity of Peterson's discipline under the "old" Policy (Pet. ¶ 121).  This ground for vacatur under the FAA is inapplicable here.  *See* note 3, *supra*.  In any event, counsel for the Union conceded (Pet. Ex. 122 (Hr'g Tr.) 52:22-53:7) that the sole issue to be decided was whether to "reduce" Peterson's discipline to two games on the ground that the six-game suspension allegedly was not "fair and consistent" with prior League discipline, Pet. Ex. 126 (Award) at 3, and argued at length about whether the "old" or "new" Policy should be applied (*e.g.*, Pet. Ex. 122 (Hr'g Tr.) 27:20-28:21).   In answering that question, the Hearing Officer interpreted the documents on which the parties relied – including both the Policy and the August 2014 Letter – which is exactly what he was authorized to do.  *See Midwest Div. - LSH, LLC v. Nurses United for Improved Patient Care*, 720 F.3d 648, 651 (8th Cir. 2013) (A court "will not give credence to [a party's] argument that the arbitrator had no authority to decide an issue it agreed to submit." (internal citation omitted)).

than the first," whereas "[i]n this case there was only one decision by the Commissioner

on the player's discipline." Pet. Ex. 126 (Award) at 4-5; *see also* Pet. ¶ 118 (conceding

that "Mr. Henderson cites the *Rice* decision for other points"). Where, as here, the

arbitrator "specifically identifie[s] the critical factual differences" between the case

before him and prior awards, the arbitrator's decision not to award preclusive effect must

be confirmed. *Am. Nat'l Can Co.*, 120 F.3d at 892, 893 (not sufficient for losing party to

complain that there "appear[s] to be some inconsistency between the arbitrator's

decision" and prior decisions); *SBC Advanced Solutions, Inc. v. Commc'ns Workers of*

*Am., Dist. 6*, --- F. Supp. 2d ---, 2014 WL 4385356, at *7 (E.D. Mo. Sept. 3, 2014)

(arbitrator's "reasoned and well-articulated departure from the prior awards" did not

provide grounds for vacatur).[5]

The Hearing Officer further rejected the Union's argument that, under *Rice* and

other arbitration precedent, Peterson's discipline should have been capped at two games.

He held that the Policy in no way restricted domestic violence discipline to a two-game

suspension; that the law of the shop permitted the Commissioner to "increase discipline"

when it proved ineffective at deterring conduct; and that the *Rice* decision recognized that

---

[5] For this reason, Plaintiff's repeated reliance (Pet. ¶¶ 114-115, 118-119) on
*Trailways Lines, Inc. v. Trailways, Inc. Joint Council*, 807 F.2d 1416, 1423 (8th Cir.
1986), is misplaced. *Trailways* affirmed vacatur of an arbitration award as failing to
"draw its essence" from the parties' agreement when the arbitrator "cop[ied] a substantial
portion of his analysis from a completely different case rather than focusing on the facts
of the grievance before him," and also "failed to discuss" on-point precedent and CBA
provisions "despite their obvious relevance to the issue" central to the arbitration. *Id.* at
1423-24, 1426. In contrast, the Hearing Officer explicitly discussed and distinguished
the relevant Policy documents, the CBA, and *Rice* (the Union's primary authority) – thus
exercising the very role under the CBA for which the parties bargained. *See Am. Nat'l*
*Can Co.*, 120 F.3d at 891-93.

the Commissioner had broad authority – including to impose an "indefinite suspension" – under the Policy.  *See* Pet. Ex. 126 (Award) at 4-5; *see also id.* at 4 (under law of the shop, Commissioner "should not be handcuffed by prior cases" in determining discipline) (quoting Pet. Ex. 103 (Appeal Decision dated Sept. 21, 2010) at 3).  Furthermore, the Hearing Officer specifically noted that Peterson's case was not analogous to those prior cases given the "egregious" nature of his conduct.  Pet. Ex. 126 (Award) at 5.  In other words, even if the Union were correct that prior cases should control this case, the Commissioner's decision was nevertheless appropriate given Peterson's conduct.  This decision, which was based on the Hearing Officer's careful interpretation of the CBA, the Policy, and prior cases, cannot be relitigated here.

*Third*, the Union complains that the Award improperly affirmed "unauthorized" discipline in the form of required counseling and leave without pay.  The Hearing Officer specifically rejected each of these arguments, too, based on a careful reading of the Policy and the law of the shop.  He rejected Peterson's arguments that the Commissioner lacked authority to require Peterson to undergo counseling (Pet. Ex. 122 (Hr'g Tr.) 44:21-48:21), given that the plain terms of both the existing Policy and the August 2014 Letter independently gave the Commissioner such authority.  *See* Pet. Ex. 126 (Award) at 5 (citing Policy); Pet. Ex. 2 (Policy) at 1-2 (noting that players subject to Policy "'generally will be required to undergo a formal clinical evaluation," and "may be . . . required to participate in an education program, counseling or other treatment deemed appropriate by health professionals"); *see also* Pet. Ex. 126 (Award) at 5 (August 2014 Letter's counseling requirements were designed to be "consistent with [the] Personal Conduct

Policy").  Indeed, such counseling programs "are designed to provide assistance and are not considered discipline" in the first place.  Pet. Ex. 2 (Policy) at 2.

Likewise, the Hearing Officer disagreed with the Union's argument (Pet. Ex. 122 (Hr'g Tr.) 109:2-11, 136:13-139:12, 1423-143:12) that Peterson's placement on paid leave was "disciplinary" (Pet. Ex. 126 (Award) at 8) – a finding fully consistent with traditional labor principles.  *See Pulczinski v. Trinity Structural Towers, Inc.*, 691 F.3d 996, 1007-08 (8th Cir. 2012) (placement on paid administrative leave pending an investigation into misconduct does not constitute an adverse employment action).  In doing so, the Hearing Officer relied on the law of the shop in this very case – specifically, a recent decision by a neutral NFL arbitrator *rejecting* the argument that Peterson's placement on paid leave violates the CBA.  *See* Schmitt Decl. Ex. D at 6 (*In re Adrian Peterson* (Nov. 18, 2014) (Das, Arb.) (rejecting Union's argument that Commissioner violated the CBA by retaining Peterson "on the Commissioner-Exempt list during the period in which it was reviewing his conduct for potential disciplinary action under the Personal Conduct Code").[6]  Needless to say, the NFLPA's attempt to make the same argument for the third time here must fail.  *See* Pet. ¶ 153 (alleging the "unauthorized use of the Commissioner's Exempt List to suspend Mr. Peterson without any disciplinary process" in violation of the CBA); *see McGrann*, 424 F.3d at 748 (even when error is alleged, courts "have absolutely no authority to reconsider the merits of an arbitration award").

---

[6] The NFLPA fails to mention or cite Arbitrator Das' decision in its Petition.

*****

In sum, the Hearing Officer rejected all of the Union's arguments, based on a "careful reading" of the relevant documents and precedent viewed in light of the Hearing Officer's factual findings, which are entitled to deference.  Pet. Ex. 126 (Award) at 4. Plaintiff cannot demonstrate that the Award was not at least "arguably" construing or applying the agreement and prior NFL decisions, or that the Hearing Officer "ignore[d] the plain language of the contract."  *PSC Custom, L.P. v. United Steelworkers Int'l Union, Local 11-770*, 763 F.3d 1005, 1008-09 (8th Cir. 2014) (citations omitted).  That Plaintiff disagrees with the Hearing Officer's factual findings and legal conclusions "is of no consequence" because it was the Hearing Officer's construction of the CBA, policies, and precedent – not this Court's – that the parties bargained for.  *Midwest Coca-Cola Bottling Co. v. Allied Sales Drivers & Gen. Workers Union, Local 792*, 89 F.3d 514, 518 (8th Cir. 1996); *see Electrolux*, 416 F.3d at 853.

## III.  THE AWARD CANNOT BE VACATED ON THE GROUND OF FUNDAMENTAL FAIRNESS

Plaintiff contends that the Award must be vacated on "fundamental fairness" grounds (Pet. ¶¶ 124-131) because, at the time Peterson physically abused his child, he was not aware that he could be subject to the enhanced discipline announced in August. Pet. ¶ 131 ("[A]t the time of the conduct at issue (May 2014), Mr. Peterson did not have any notice that, several months later, Commissioner Goodell would announce" enhanced discipline.).  In addition, Plaintiff claims Troy Vincent told Peterson he would be subject only to a maximum two-game suspension under the "old" Policy and that the

Commissioner similarly made statements in the *Rice* proceeding indicating that the discipline announced in August 2014 would apply to players only "going forward."  Pet. ¶¶ 126-130.  Plaintiff's contentions that these circumstances underlying Peterson's discipline render the Award fundamentally unfair are unfounded and, in any event, provide no basis for vacatur.

To begin with, the Eighth Circuit has "never recognized 'fundamental unfairness' as a basis for vacating an arbitration award."  *Hoffman v. Cargill Inc.*, 236 F.3d 458, 462 (8th Cir. 2001).  Indeed, the Eighth Circuit has made clear that such a standard would apply only "to *arbitration schemes* so deeply flawed as to preclude the possibility of a fair outcome."  *Id.* at 463 (emphasis added).  Thus, to the extent allegations of fundamental fairness can ever support vacatur, they do so only where they relate to the conduct of the hearing itself.  *See id*; *El Dorado Sch. Dist. No. 15 v. Continental Cas. Co.*, 247 F.3d 843, 848 (8th Cir. 2001) (party might demonstrate that an arbitrator's error "is not simply an error of law, but [] so affects the right of a party that it may be said that he was deprived of a fair hearing") (quoting *Grahams Serv. Inc. v. Teamsters Local 975*, 700 F.2d 420, 422 (8th Cir. 1982)).[7]

Plaintiff takes no issue with the conduct of the hearing itself; indeed, it prevailed on the most significant procedural motion it made below when it convinced the Hearing Officer to compel Troy Vincent's testimony.  Pet. Ex. 126 (Award) at 6-7 (noting that

---

[7]  The Union cites a handful of arbitration awards applying "fundamental fairness" and "industrial due process" concepts in evaluating claims on the merits.  *See* Pet. ¶¶ 124-126.  Those decisions say nothing about the standard of review a federal court applies in reviewing an arbitration award under the LMRA.

Vincent's "testimony was described [by Peterson's counsel] as 'essential to a fair hearing'"). Instead, the Union simply re-raises the retroactivity and notice arguments it made at the appeal hearing. But once again, those arguments were specifically rejected based on factual findings that cannot be challenged here. *See* Pet. Ex. 126 (Award) at 5-6 (finding "no indication that [Peterson] ever relied in any way on the level of discipline that would be imposed for conduct such as his"); Pet. Ex. 126 (Award) at 4-5, 7 (finding that neither the Commissioner's nor Vincent's statements precluded a six-game suspension). The Hearing Officer also found all of the Union's cited precedent, involving notice over such minor infractions as being late to practice, to be "distinguishable." Pet. Ex. 126 (Award) at 6; *see id.* at 5-6 (noting that Peterson never argued that he "might not have inflicted those injuries on his young son if he had known he could be suspended six weeks rather than two").

To be sure, the Union suggests that these factual findings and legal conclusions are wrong. But whether the Hearing Officer is "right or wrong is a question of contract interpretation" reserved exclusively to the arbitrator. *Misco*, 484 U.S. at 36-37. The Union cites no authority for the proposition that an alleged (or even a proven) misapplication of law or facts by an arbitrator renders an award fundamentally unfair. To the contrary, the Union's own cited authority stands for the opposite proposition: an arbitrator's misconduct must affect the fairness of the hearing itself, and *cannot* be "simply an error of law." *Grahams Serv. Inc. v. Teamsters Local 975*, 700 F.2d 420, 422 (8th Cir. 1982) (internal citations and quotations omitted) (arbitrator's exclusion of evidence and refusal to postpone hearing did not deprive company of fair hearing); *see,*

*e.g.*, *Bellantuono v. ICAP Sec. USA, LLC*, 557 F. App'x 168, 176 (3d Cir. 2014) (panel's refusal to allow party "to search for evidence in documents that it found to be privileged or otherwise not discoverable," even if "incorrect," did not deprive party of a fair hearing); *Laws v. Morgan Stanley Dean Witter*, 452 F.3d 398, 400-01 (5th Cir. 2006) (panel's refusal to delay proceedings did not deprive party of a fair hearing).

The Union cannot point to anything "unfair" – much less "fundamentally" so – about the conduct of the hearing.

## IV.   THE AWARD CANNOT BE VACATED BASED ON EVIDENT PARTIALITY

Beyond challenging the merits of the Award, Plaintiff also seeks vacatur on the ground that the Hearing Officer was "evidently partial."  Pet. ¶¶ 141-151; *see also* Pet. ¶ 37 (citing 9 U.S.C. § 10(a)(2)).  However, by agreeing in the CBA that the Commissioner or his designee would serve as hearing officer in any Article 46 appeal, the Union has waived its right to challenge the award based on "evident partiality."  Pet. Ex. 1 (CBA Art. 46) § 2(a); *see Williams*, 582 F.3d at 885.  The Union's bias argument also fails because it does not even allege actual prejudice, which this Circuit requires to vacate an arbitration award.  *Williams*, 582 F.3d at 885 (evident partiality "is not made out by the mere appearance of bias") (quoting 3 Fed. Proc. § 4:119 (Lawyers ed. 2009)).

### A.   Plaintiff Has Waived The Right To Challenge The Award Based On Evident Partiality.

Parties to an arbitration agreement "choose their method of dispute resolution, and can ask no more impartiality than inheres in the method they have chosen."  *Williams*, 582 F.3d at 885 (quoting *Winfrey v. Simmons Foods, Inc.*, 495 F.3d 549, 551 (8th Cir.

2007)).  Where, as here, the CBA expressly contemplates a partial arbitrator, "evident partiality" provides no basis for vacatur.  *Williams*, 582 F.3d at 886.

Plaintiff's argument that the Award should be vacated based on evident partiality is squarely foreclosed by *Williams*, a case involving the same League, same parties, and a virtually identical arbitration procedure.  In *Williams*, two professional football players had appealed their suspensions for violating the collectively bargained NFL Steroid Policy.  *See id.* at 868-70.  As in this case, the relevant appeal procedure provided that either the "Commissioner or his designee" could serve as appeal arbitrator, and the Commissioner designated the NFL's general counsel.  *Id.* at 869-71.  The Eighth Circuit flatly rejected the NFLPA's bias argument, explaining that the NFLPA "waived its objection" to the general counsel's bias by "agreeing in the CBA that the Commissioner's designee . . . could serve as arbitrator."  *Id.* at 886; *see also Nat'l Football League Players Ass'n v. Nat'l Football League*, 654 F. Supp. 2d 960, 968 (D. Minn. 2009) (reasoning that the union had "agreed to a certain amount of partiality in the arbitrator" when it agreed the Commissioner or his designee would hear appeals under the Policy), *aff'd sub nom. Williams*, 582 F.3d 863.

This binding decision is well supported by many other decisions involving collective bargaining agreements in the professional sports context.  *See Nat'l Hockey League Players' Ass'n v. Bettman*, No. 93 Civ. 5769 (KMW), 1994 WL 738835, at *14, *19 (S.D.N.Y. Nov. 9, 1994) (rejecting union's bias argument because any "inherent tendency" by the arbitrator to favor a particular position "was fully known or knowable to the [NHLPA] at the time that it signed the Agreement" allowing the Commissioner to

resolve disputes); *see, e.g.*, *Black v. Nat'l Football Players Ass'n*, 87 F. Supp. 2d 1, 5-6

(D.D.C. 2000) (rejecting bias challenge where NFLPA contract advisor admitted that he

was "aware of and freely agreed to the arbitration terms," including that his discipline

appeal would be decided by an arbitrator selected by the NFLPA); *Mandich v. N. Star*

*P'ship*, 450 N.W.2d 173 (Minn. Ct. App. 1990) (rejecting alleged arbitrator bias when

NHL President's role as arbitrator in disputes between players and the club was explicitly

provided in CBA).  Indeed, the Tenth Circuit has rejected a bias challenge to the same

Hearing Officer who issued the Award in this case.  *See Williams v. Nat'l Football*

*League*, No. 12-cv-00650-CMA-MJW, 2012 WL 2366636, at *7-8 (D. Colo. June 21,

2012), *aff'd*, 495 F. App'x at 894.  In doing so, the Tenth Circuit distinguished between

appeal procedures where the NFLPA agreed to the designation of a partial arbitrator from

"typical" arbitrations heard by neutral arbitrators.  *See* 495 F. App'x at 898 n.2.

   Here, too, the NFLPA assented to either the Commissioner or his designee

deciding Article 46 appeals.  Pet. Ex. 1 (CBA), Art. 46 § 2(a) "[T]he Commissioner shall,

after consultation with the Executive Director of the NFLPA, appoint one or more

designees to serve as hearing officers.").  Accordingly, it has "waived its objection to

[Henderson] serving as arbitrator by agreeing in the CBA that the Commissioner's

designee (which is what [Henderson] was) could serve as arbitrator[.]"  *Williams*, 582

F.3d at 886.

   The NFLPA argues that the parties' express agreement "does not negate the

evident partiality rule in a unique case like this, where the subject of the arbitration is . . .

the conduct of Commissioner Goodell and NFL Executive Vice President Vincent in

conducting a fundamentally unfair discipline process[.]" Pet. ¶ 144; *see id.* at *¶* 147 (arguing that the Commissioner has a "personal stake" in the outcome). According to the Union, "[o]nce it is recognized that Commissioner Goodell could not serve as the arbitrator, it follows, *a fortiori*, that Mr. Henderson . . . similarly could not serve without violating the evident partiality doctrine." *Id.* at ¶ 148. But the parties' CBA explicitly permits even the Commissioner himself to serve as the Hearing Officer in every Article 46 appeal, without limitation. Considering that the Commissioner could have served as Hearing Officer in this case, it in no way "follows" that his "designee . . . could not serve" as well. Pet. ¶ 148. Crediting this argument would write Article 46, § 2(a) out of the CBA, considering that, as the one who imposes "conduct detrimental" discipline under Article 46, the Commissioner's conduct is at issue *in every Article 46 appeal*. The Union's argument is directly at odds with the Eighth Circuit's binding *Williams* decision, which upheld the Commissioner's designation of the sitting general counsel of the NFL as an appropriate designee in a disciplinary appeal despite allegations that the general counsel's *own conduct* rendered him partial. *See Williams*, 582 F.3d at 885 (rejecting Union's partiality argument because it could not "claim to be surprised" that NFL general counsel met with the disciplined players' team multiple times and even "discussed the Players" and their litigation threats). Especially considering the Union's admission that Hearing Officer Henderson has served as an arbitrator "in many prior Article 46 appeals without objection from the NFLPA," Pet. ¶ 149, the Union's bias and partiality arguments should be rejected out of hand.[8]

---

[8] The NFLPA relies on *Morris v. New York Football Giants, Inc.*, 575 N.Y.S.2d

###### B.    Plaintiff Cannot Demonstrate Actual Prejudice.

The Union has a "heavy burden" to show more than the "mere appearance" of

bias. *Williams*, 582 F.3d at 885.  Its speculative claims of possible prejudice cannot meet

that burden.

When an agreement "entitles the parties to select interested arbitrators, 'evident

partiality' cannot serve as a basis for vacating an award under [the FAA] absent a

showing of prejudice." *Winfrey*, 495 F.3d at 551 (internal citations omitted).  Thus, if the

parties have expressly agreed to select partial arbitrators, "the award should be confirmed

unless the objecting party proves that the arbitrator's partiality prejudicially affected the

award." *Id.* at 551-53 (appellant failed to meet his burden to show that arbitrator's

partiality "deceived or misled the other two arbitrators, prejudiced [its] ability to present

its case, or in any way affected the award").

The NFLPA conceded below that it had no evidence of "actual prejudice."  Pet.

Ex. 122 (H'rg Tr.) 18:10-15 (clarifying that "I want to make it clear that the argument we

made was based on an objective standard, in other words that you  would be *viewed* as

evidently partial, not that, in fact, you know, we have evidence as to whether or not you

---

1013 (N.Y. Sup. Ct. 1991), *aff'd*, 468 F.2d 1064 (2d Cir. 1972), and *Erving v. Virginia Squires Basketball Club*, 349 F. Supp. 716 (E.D.N.Y. 1972), but both are inapposite.  Pet. ¶¶ 55, 144, 146.  Those cases involved specific evidence of the hearing officer's direct prior involvement in the underlying dispute.  In *Morris*, the Commissioner had previously served as outside counsel to the NFL and had advocated in support of the policy challenged in the arbitration.  *See Morris*, 575 N.Y.S.2d at 1016-17.  In *Erving*, the Commissioner was a partner in the law firm representing the team that was a party to the dispute.  *See Erving*, 349 F. Supp. at 719.  Here, the Hearing Officer specifically noted that he had no prior involvement in this case and in fact had no knowledge other than what was published in media reports.  Pet. Ex. 121 (Decision on Recusal).

are, you know, improper or not") (emphasis added).  Nor can the Union make an "actual

prejudice" showing here.  Instead, the Union either makes inappropriate assumptions as

to the appearance of bias, *e.g.*, Pet. ¶ 148 (arguing that Henderson is biased "a fortiori"

based on the Commissioner's alleged bias), or relies on press statements to establish the

same, *e.g.*, Pet. ¶ 148 (arguing that "any reasonable observer would *view* Mr. Henderson

as being evidently partial") (emphasis added).  The NFLPA then makes the conclusory

assertion, without providing any examples, that the Hearing Officer's refusal to recuse

himself "tainted the entire arbitration proceeding."  Pet. ¶ 149.  None of these statements

meets the Union's heavy burden necessary to show actual prejudice.  Nor does the Union

even contend that the hearing officer's bias prejudiced its ability to present the case.

Indeed, over the NFL's objection, the hearing officer ordered Mr. Vincent to testify.  Pet.

Ex. 122 (Hr'g Tr.) 141:4-10.  This hardly evidences bias in favor of the NFL.

 In fact, despite clear Eight Circuit precedent holding that evident partiality cannot

be "made out by the mere appearance of bias," 582 F.3d at 885, the NFLPA incorrectly

asserts that "even the appearance of bias is enough to constitute evident partiality" in this

context.  Pet. ¶ 142.  In support of this argument, the Union cites several inapposite cases

involving *neutral* arbitrators who violated their contractual duty to disclose certain

information.  *See id.*; *see, e.g.*, *Commonwealth Coatings Corp. v. Cont'l Cas. Co.*, 393

U.S. 145, 146-50 (1968) (finding evident partiality where arbitrator failed to disclose

close business relations with a party to the arbitration); *Montez v. Prudential Sec., Inc.*,

260 F.3d 980, 982 (8th Cir. 2001) (arbitration rules required "arbitrators to disclose

'direct or indirect financial or personal interest in the outcome of the arbitration' and any

such relationships 'that are likely to affect impartiality or might reasonably create an appearance of partiality or bias'" (internal citations omitted)); *Olson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 51 F.3d 157, 159-60 (8th Cir. 1995) ("evident partiality" warranted vacatur where the arbitrator failed to disclose his job titles and his employer's business relationship with a party to the arbitration). These cases have no bearing here, where it is undisputed that the Hearing Officer's ties to the NFL were fully disclosed and where the parties expressly bargained for and agreed to accept a partial arbitrator. *See Williams*, 582 F.3d at 885-86; *Winfrey*, 495 F.3d at 552 (rejecting argument that failure to disclose extent of relationship with party created an impermissible appearance of bias because "[t]here is no requirement that party-appointed arbitrators make any disclosures").

Finally, the NFLPA also claims the Award "smacks of bias and a results-oriented approach" because the arbitrator "ignored" statements by Peterson "express[ing] his regret" in favor of "unverified and out-of-context newspaper reports." Pet. ¶ 150-51. As noted, however, the Court is not permitted to reconsider the Hearing Officer's findings on the merits so long as he is even "arguably construing or applying the contract." *Garvey*, 532 U.S. at 509 (noting that "'improvident, even silly, factfinding' does not provide a basis for a reviewing court to refuse to enforce the award" (citing *Misco*, 484 U.S. at 39)).[9]

---

[9] Nor is there any merit to the Union's claim, Pet. ¶ 26, that the Hearing Officer's determination that Peterson had engaged in other incidents of child abuse was "wholly unsupported" and based only on newspaper accounts. *See* Schmitt Decl. Ex. K (Petition

## V.     THE UNION IS NOT ENTITLED TO THE REMEDY IT SEEKS

Besides vacatur, the Union also seeks "an order declaring that Mr. Peterson is entitled immediately to be reinstated[.]" Pet. at 73. But the Union cites no authority supporting that request, which is squarely foreclosed by Supreme Court precedent. *See Garvey*, 532 U.S. at 511 ("[E]stablished law ordinarily precludes a court from resolving the merits of the parties' dispute on the basis of its own factual determinations, no matter how erroneous the arbitrator's decision."). Thus, even if the Court had reason to vacate the Award, the only "appropriate remedy [would be] to remand the case for further arbitration proceedings." *Id.*; *U.S. Postal Serv. v. Am. Postal Workers Union*, 907 F. Supp. 2d 986, 995 (D. Minn. 2012) (vacating arbitration award and concluding that remand for further arbitration proceedings was appropriate remedy).

### CONCLUSION

The Petition to Vacate the Arbitration Award should be denied, and this case should be dismissed with prejudice.

Dated: January 16, 2015                    NILAN JOHNSON LEWIS PA

                                           By:  s/ Joseph G. Schmitt
                                               Joseph G. Schmitt (Reg. No. 231447)
                                               Peter Gray (Reg. No. 025809X)
                                               120 South Sixth Street, Suite 400
                                               Minneapolis, MN 55402
                                               Phone:  612.305.7500
                                               jschmitt@nilanjohnson.com
                                               pgray@nilanjohnson.com

---

For Child In Need Of Protective Services) (Peterson admitted he had hit his child with a belt on a different occasion).

/s/ Daniel L. Nash

AKIN GUMP STRAUSS HAUER & FELD
LLP

Daniel L. Nash (*pro hac vice*)
dnash@akingump.com
Stacey R. Eisenstein (*pro hac vice*)
seisenstein@akingump.com
Marla S. Axelrod (*pro hac vice*)
maxelrod@akingump.com
James E. Tysse (*pro hac vice*)
jtysse@akingump.com

*Attorneys for Defendants National Football
League and National Football League
Management Council*