```
                    UNITED STATES DISTRICT COURT
                       DISTRICT OF MINNESOTA
                      Civil No. 14-4990(DSD/JSM)
```

National Football League
Players Association, on its
own behalf and on behalf of
Adrian Peterson,

        Petitioner,

v.                                                **ORDER**

National Football League and
National Football League
Management Council,

        Respondents.

    Jeffrey L. Kessler, Esq., David L. Greenspan, Esq. and Winston and Strawn LLP, 200 Park Avenue, Suite 45118, New York, NY 10166 and Barbara P. Berens, Esq. and Berens & Miller, PA, 80 South Eighth Street, Suite 3720, Minneapolis, MN 55402, counsel for petitioner.

    Daniel L. Nash, Esq., Marla S. Axelrod, Esq. and Aikin Gump, 1333 New Hampshire Avenue N.W., Washington, D.C. 20036 and Joseph G. Schmitt, Esq. and Peter D. Gray, Esq. and Nilan, Johnson, Lewis PA, 120 South Sixth Street, Suite 400, Minneapolis, MN 55402, counsel for respondents.

    This matter is before the court upon the petition to vacate arbitration award by petitioner National Football League Players Association (NFLPA), on its own behalf and on behalf of Adrian Peterson. Respondents are the National Football League and the National Football League Management Council (collectively, NFL). Based on a review of the file, record, and proceedings herein, and for the following reasons, the court grants the petition.

**BACKGROUND**

This arbitration dispute arises out of the discipline imposed by NFL Commissioner Roger Goodell on Minnesota Vikings running back Adrian Peterson following Peterson's corporal punishment of his son in May 2014.

**I.   The Parties' Relationship**

The parties' relationship is governed by the Collective Bargaining Agreement signed on August 4, 2011 (CBA). NFLPA Ex. 1. Relevant here, Article 46 of the CBA authorizes the Commissioner to impose discipline on NFL players for "conduct detrimental to the integrity of, or public confidence in, the game." See id. § 1(a). Article 46 allows a player to appeal the Commissioner's disciplinary decision to a hearing officer appointed by the Commissioner. See id. § 2(a). The Standard NFL Player Contract, which is part of the CBA, further provides that on a finding of conduct detrimental to the league, the Commissioner "will have the right, but only after giving Player the opportunity for a hearing ... to fine Player in a reasonable amount; to suspend Player for a period certain or indefinitely; and/or to terminate this contract." Id. Ex. 1A ¶ 15. The NFL's Personal Conduct Policy (Policy), which is revised periodically, sets forth what constitutes conduct detrimental to the league and what discipline may follow. See id. Ex. 2.

The Policy in place during the underlying incident provided that the NFL may impose discipline when the player has committed a criminal offense, including domestic violence. Id. at 1. Consistent with the Player Contract, the Policy also stated that discipline may include fines, suspension, or banishment from the league. Id. at 2. The Policy did not set forth the presumed length of suspension for particular types of conduct, but noted that the disciplinary response "will be based on the nature of the incident, the actual or threatened risk to the participant and others, any prior or additional misconduct (whether or not criminal charges were filed), and other relevant factors." Id.

On August 28, 2014, in response to a well-publicized domestic violence incident involving Baltimore Ravens running back Ray Rice, the Commissioner issued an enhanced Personal Conduct Policy (New Policy), increasing the sanctions for domestic violence and sexual assault incidents.[1] Id. Ex. 3. Specifically, the New Policy announced a "suspension without pay of six games for a first offense, with consideration given to mitigating factors, as well as a longer suspension when circumstances warrant." Id. at 3; see

---

[1] Rice initially received a two-game suspension. The public and media excoriated the Commissioner for failing to impose harsher penalties on domestic violence offenders. See id. Exs. 37-48. The New Policy, although more severe, did little to quell the public outcry. See id. Exs. 49-62. Peterson's indictment, discussed in more detail below, came during the firestorm over Rice's discipline and the NFL's perceived lenity with respect to domestic violence offenders.

also id. Ex. 4.  It is undisputed that under the previous Policy, first-time domestic violence offenders faced a likely maximum suspension of two games.  See id. Ex. 35, at 181:5-24, 368:5-13; Ex. 119, at 5 & n.4.

**II. Peterson's Disciplinary Process**

On September 11, 2014, a Montgomery County, Texas grand jury indicted Peterson on a charge of felony reckless or negligent injury of a child, as a result of the May 2014 incident involving his son. After learning of the indictment, the Vikings deactivated Peterson for the next game on September 14.  On September 18, the NFLPA, on behalf of Peterson, and the NFL agreed in writing to place Peterson on the Commissioner's Exempt List with full pay "until the criminal charges ... are adjudicated."  Schmitt Decl. Ex. B, at 1 (Letter Agreement).  The Letter Agreement further stated that "[n]o discipline will be processed or imposed against [Peterson], by the Club or the League, until after the pending criminal charges are adjudicated."  Id.

On November 4, Peterson pleaded nolo contendere to a reduced misdemeanor charge of reckless assault.  NFLPA Ex. 30, at 2.  The court issued a deferred adjudication order and placed Peterson on community supervision for two years, at the conclusion of which the charge may be removed from his record.  See id.  Two days later, the NFL acknowledged Peterson's plea and advised him that the "matter warrants review for potential disciplinary action under the Personal

4

Conduct Policy." Id. Ex. 5, at 1. The NFL requested that Peterson provide certain information regarding the criminal case and notified him that he would have the opportunity to participate in a hearing before the Commissioner imposed any discipline. Id. The NFL also informed Peterson that he would remain on the Exempt List in the interim. Id. at 2.

On November 11, the NFL notified Peterson that he was expected to attend a hearing on November 14 at the NFL's offices in New York. Id. Ex. 6. The NFLPA responded on Peterson's behalf with several questions regarding the agenda and process for the proposed hearing. See id. Ex. 7. The NFL answered that Peterson would be permitted to present "any information or evidence in support of his position" and that the NFL would determine the appropriate discipline, if any, under "the policies." Id. Ex. 10. The NFL further explained that it had invited "some outside people" to the hearing to "broaden [the NFL's] perspective" but did not indicate what role those individuals would play. Id. Among those invited were Lisa Friel, a former prosecutor, and Dr. April Kuchuk, a consultant on child welfare and family violence. Id.

The NFLPA then asked to reschedule the hearing to early the following week to accommodate Peterson's and his representatives' schedules. Id. Ex. 12, at 1, 3. The NFLPA also complained that holding a formal hearing violated the parties' "long-standing custom and practice regarding such meetings as a part of the process for

5

possible discipline pursuant to Article 46 [of the CBA]." Id. at 2. Concerned with the proposal to include outside people, the NFLPA requested further clarification about the role of each attendee. Id. The NFLPA nevertheless agreed to have Peterson, his contract advisor, and NFLPA attorneys attend a meeting with the Commissioner and NFL lawyers. Id.

On November 17, not having received a response from the NFL, the NFLPA inquired as to the status of the proceedings and offered November 19 as a possible meeting date. Id. Ex. 15. The NFL responded that Peterson "elected not to attend or participate as requested, leaving the league to move forward with the consideration of discipline based on the information available." Id. Ex. 16. The next day, the NFLPA notified the NFL that Peterson would submit his position to the Commissioner in writing. Id. Ex. 17. The NFL did not give him the chance to do so.

In a letter dated November 18, the Commissioner informed Peterson that his May 2014 conduct was detrimental to the league and noted, without specificity, that Peterson had engaged in similar conduct in the past and appeared inclined to repeat the behavior in the future. Id. Ex. 18, at 2. The Commissioner then applied the New Policy to Peterson:

> The modifications of the Personal Conduct Policy that were announced on August 28 establish a baseline discipline of a suspension without pay for six games for certain offenses, including a first offense of assault, battery, or domestic violence. That announcement also identified several aggravating circumstances that would

> warrant higher levels of discipline. A number of those circumstances are present here[.]

Id. The Commissioner suspended Peterson without pay for "at least the remainder of the 2014 season," fined him six weeks' pay, inclusive of any amounts forfeited during the suspension, and ordered him to participate in a counseling and treatment program, the results of which would dictate when and if Peterson would be permitted to return to the league. Id. at 3.

The Commissioner specifically directed Peterson to participate in counseling supervised by NFL designee Dr. Kuchuk, rather than Peterson's chosen therapist. Id. at 2-3. The Commissioner indicated that he would review Peterson's progress periodically, beginning on April 15, 2015. Id. at 4. He warned that a "failure to cooperate and follow your plan will result in a lengthier suspension without pay." Id. Finally, the Commissioner advised Peterson that he would remain on the Exempt List with pay pending any appeal. Id. At that point, Peterson had been on the Exempt List for nine weeks, missing eight games. Id. at 1.

**III. The Arbitration**

The NFLPA immediately appealed the discipline, triggering the procedure set forth in Article 46 of the CBA. See id. Ex. 20. The NFLPA specifically challenged the application of the New Policy to conduct occurring before its implementation, as well as the Commissioner's "new and obfuscated disciplinary process," which prevented Peterson from participating in pre-disciplinary

7

discussions in violation of his "industrial due process rights." Id. at 4. The NFLPA requested that the Commissioner recuse himself from hearing the appeal and that he appoint a neutral arbitrator. Id. at 5. The NFL responded by setting the arbitration for December 2 and appointing Harold Henderson as the Commissioner's designated hearing officer. Id. Ex. 21.

The NFLPA asked Henderson to recuse given his "inextricable ties to the League Officer and Commissioner Goodell" and evident partiality.[2] Id. Ex. 22, at 1. Henderson declined, finding no evidence of his partiality and noting that Article 46 expressly allows the "Commissioner or his designee" to serve as hearing officers. Id. Ex. 23, at 2. The arbitration took place on December 2 and 4. See id. Ex. 122; see also Ex. 24. The NFLPA identified the issues presented as follows: (1) whether the Commissioner impermissibly applied the New Policy to Peterson; (2) whether Peterson was deprived of a fair disciplinary process; (3) whether the imposition of a psychiatric counseling component is permissible under the CBA; and (4) whether the Exempt List can be used as a form of discipline under the CBA. See id. Ex. 20, at 4-5.

Henderson rejected each of the NFLPA's arguments and upheld the Commissioner's discipline in its entirety. As to the issue of

---

[2] Henderson was an NFL executive for nearly two decades and apparently continues on in a part-time capacity, earning $2.5 million in compensation from the NFL since 2009. See id. at 2-3.

retroactive application of the New Policy, Henderson concluded that the Commissioner had "broad discretion" to impose discipline under the New Policy. Id. Ex. 126, at 4. Henderson did not directly address the NFLPA's retroactivity argument, and instead simply concluded that the New Policy was consistent with its prior iterations and that the discipline imposed "fits either or both, and one need not pick one or the other to conclude it was entirely 'fair and consistent.'" Id. at 5. Henderson acknowledged that the discipline imposed was greater than in previous cases under the old Policy, but reasoned that the egregious facts justified harsher punishment. Id. He also noted that Peterson did not require advance warning of increased discipline because the record did not support a finding that such knowledge would have changed his behavior. Id. at 5-6.

In rejecting the argument that Peterson was denied a fair pre-disciplinary process, Henderson determined that Peterson did not have a right to be heard before the Commissioner imposed discipline, despite such prior practice. Id. at 6. Henderson further declined to find evidence of retaliation for Peterson's failure to attend the November 14 hearing. Id. at 8. Finally, Henderson "reject[ed] the argument that placement in Commissioner Exempt status is discipline" without explanation. Id. He did not address the counseling issue other than to say that the Commissioner has the discretion to order "counseling or other treatment deemed appropriate by health

9

professionals." Id. at 5. On December 15, 2014, the NFLPA filed a petition to vacate the arbitration award under Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185 (LMRA) and Section 10 of the Federal Arbitration Act, 9 U.S.C. § 10 (FAA).

## DISCUSSION

### I.   Standard of Review

For purposes of this case, the standard of review under the LMRA and the FAA is the same. Alcan Packaging Co. v. Graphic Commc'n Conference, Int'l Bhd. Of Teamsters & Local Union No. 77-P, 729 F.3d 839, 841 (8th Cir. 2013). Courts give decisions by labor arbitrators "substantial deference." Associated Elec. Coop., Inc. v. Int'l Bhd. of Elec. Workers, Local No. 53, 751 F.3d 898, 901 (8th Cir. 2014). "The federal labor laws 'reflect a decided preference for private settlement of labor disputes.'" Id. (quoting United Paperworkers Int'l Union v. Misco, Inc., 484 U.S. 29, 37 (1987)). Therefore, "as long as the arbitrator is even arguably construing or applying the [CBA] and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision." Misco, 484 U.S. at 38.

Arbitration awards, however, are not inviolate, and the court need not merely rubber stamp the arbitrator's interpretations and decisions. The court must vacate the award if it fails to "draw its

essence" from the agreement, such that the arbitrator imposed "his own brand of industrial justice." Associated Elec., 751 F.3d at 901. An arbitration award may also be vacated when the arbitrator "exceed[ed] the authority given to him by the CBA or decide[d] matters parties have not submitted to him." Doerfer Eng'g v. NLRB, 79 F.3d 101, 103 (8th Cir. 1996).

## II. Petition to Vacate

The NFLPA argues that vacatur is warranted because (1) the award violates the essence of the CBA; (2) Henderson exceeded his authority by deciding the matter based on the hypothetical question of whether Peterson's punishment was permissible under the old Policy; (3) the award was fundamentally unfair given the retroactive application of the New Policy and the procedural irregularities in the pre-discipline process; and (4) Henderson was an evidently partial arbitrator.

### A. Essence of the Agreement

Although the court may not vacate an award if the arbitrator was "arguably construing or applying the CBA," vacatur is proper when the award "fails to draw its essence from the CBA or is contrary to the plain language of the [CBA]." Bureau of Engraving, Inc. v. Graphic Commc'ns Int'l Union, Local 1B, 164 F.3d 427, 429 (8th Cir. 1999). "The essence of the CBA is derived not only from its express provisions, but also from the industrial common law." Id. The industrial common law includes "past practices of the

11

industry and the shop," i.e., the law of the shop, and "the parties' negotiating history and other extrinsic evidence of intent." Id.; see also United Steelworkers of Am. v. Warrior & Gulf Navigation Co., 363 U.S. 574, 581-82 (1960) ("The labor arbitrator's source of law is not confined to the express provisions of the contract, as the industrial common law - the practices of the industry and the shop - is equally a part of the collective bargaining agreement although not expressed in it.")  The law of the shop necessarily includes prior arbitration awards.  See Warrior & Gulf, 363 U.S. at 581 ("The processing of disputes through the grievance machinery is actually a vehicle by which meaning and content are given to the collective bargaining agreement.").

The NFLPA argues that the award fails to draw its essence from the CBA because it ignores established law of the shop, namely, that the New Policy may not be retroactively applied.  The NFL responds that Henderson, after a "careful review" of the Policy and the New Policy, correctly determined that the Commissioner had "broad discretion" under the CBA to impose the enhanced discipline set forth in the New Policy.  See NFLPA Ex. 126, at 4; Resp't's Opp'n Mem. at 19.  The court disagrees.

There is no dispute that the Commissioner imposed Peterson's discipline under the New Policy.  See NFLPA Ex. 18.  It is also

undisputed that in the Rice arbitration, the hearing officer[3] unequivocally recognized that the New Policy cannot be applied retroactively, notwithstanding the Commissioner's broad discretion in meting out punishment under the CBA.  See id. Ex. 119, at 16.[4] Consistent with that recognition, the Commissioner has acknowledged that he did not have the power to retroactively apply the New Policy:  "The policy change was forward looking because the League is 'required to provide proper notice.'"  Id. at 7; id. Ex. 35, at 101:12-13, 99:21-100:15.  Yet, just two weeks later, the Commissioner retroactively applied the New Policy to Peterson.

The NFL urges the court to ignore Judge Jones's decision, as did Henderson, arguing that Rice is distinguishable with respect to "critical facts" because it involved a double discipline issue.  Am. Nat'l Can Co. v. United Steelworkers of Am., 120 F.3d 886, 890 (8th Cir. 1997).  The court finds no valid basis to distinguish this case from the Rice matter.

Although Henderson purported to rely on factual differences between Rice and this case, he did not explain how those differences would justify a different result.  Nor did Henderson explain why the well-recognized bar against retroactivity did not apply to Peterson.

---

[3]  Retired federal district court judge Barbara S. Jones presided over the Rice arbitration.

[4]  This determination is consistent with prior NFL arbitration decisions recognizing the importance of notice in advance of discipline.  See, e.g., id. Ex. 82, at 25-26; Ex. 87, at 27; Ex. 101, at 16; Ex. 36, at 6.

Even leaving the Rice decision aside, it is not seriously contested that the Commissioner understood he was constrained to apply the New Policy prospectively. See NFLPA Ex. 119, at 7; id. Ex. 35, at 101:12-13, 99:21-100:15; see also United Transp. Union, Local Lodge No. 31, 434 F2d 220, 222 (8th Cir. 1970) (recognizing that the law of the shop includes the understanding of the parties). Henderson simply disregarded the law of the shop and in doing so failed to meet his duty under the CBA. As a result, the arbitration award fails to draw its essence from the CBA and vacatur is warranted. See Trailways Lines, Inc. v. Trailways, Inc. Joint Council, 807 F.2d 1416, 1423 (8th Cir. 1986) (finding that failure to consider the law of the shop can be the sole basis to vacate an arbitration award).[5]

### B.   Exceeded Authority

The NFLPA next argues that Henderson exceeded his authority by adjudicating the hypothetical question of whether Peterson's discipline could be sustained under the previous Policy. The NFL responds that the NFLPA submitted that issue to Henderson.[6] The record belies the NFL's argument. The NFLPA submitted to Henderson

---

[5] Having concluded that the arbitration improperly upheld the Commissioner's discipline under the New Policy, the court need not consider the NFLPA's other arguments with respect to the essence of the agreement.

[6] The NFL also incorrectly argues that exceeding the scope of authority is not a proper ground for vacatur under the LMRA. See N. States Power Co. v. Int'l Bhd. of Elec. Workers, 711 F.3d 900, 903 (8th Cir. 2013) (affirming the district court's decision to vacate the arbitrator's award "for reaching beyond his authority under the CBA").

"the pure legal issue" of whether the New Policy could be applied retroactively. NFLPA Ex. 122, 21:22-22:24; see also id. Ex. 20, at 4. Nothing in the record supports a finding that the NFLPA asked Henderson to determine whether the discipline imposed was consistent with the previous Policy. Moreover, Henderson's conclusion that the New Policy is consistent with the previous Policy is contradicted by the Commissioner's own statements in which he acknowledged that the New Policy included "changes" to the Policy. See, e.g., id. Ex. 65, at 1 ("I made a mistake. I'm not satisfied with the process we went through, I'm not satisfied with the conclusions. And that's why we came out last month and said: we're going to make changes to our policies. We made changes to our discipline."); see also id. Ex. 35, at 99:21-100:15.

"When two parties submit an issue to arbitration, it confers authority upon the arbitrator to decide that issue." Local 238 Int'l Bhd. of Teamsters v. Cargill, Inc., 66 F.3d 988, 990-91 (8th Cir. 1995) (emphasis in original). "[O]nce the parties have gone beyond their promise to arbitrate and have actually submitted an issue to an arbiter, we must look both to their contract and to the submission of the issue to the arbitrator to determine his authority." John Morrell & Co. v. Local Union 304A of the United Food & Commercial Workers, 913 F.2d 544, 561 (8th Cir. 1990) (internal quotation and citation omitted). Here, Henderson strayed beyond the issues submitted by the NFLPA and in doing so exceeded

15

his authority.  As a result, vacatur is warranted on this basis as well.

Because the court finds that the arbitration award must be vacated on the grounds set forth above, it need not decide whether Henderson was evidently partial or whether the award violates fundamental fairness.  The court will remand the matter for further proceedings before the arbitrator as permitted by the CBA.  See U.S. Postal Serv. v. Am. Postal Workers Union, AFL-CIO, 907 F. Supp. 2d 986, 995 (D. Minn. 2012) (holding that the appropriate remedy on vacatur is to remand the case for further arbitration proceedings consistent with the CBA).

## CONCLUSION

Accordingly, **IT IS HEREBY ORDERED** that:

1.  The petition to vacate arbitration award [ECF No. 2] is granted; and

2.  The case is remanded for such further proceedings consistent with this order as the CBA may permit.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:  February 26, 2015

                                              s/David S. Doty
                                              David S. Doty, Judge
                                              United States District Court